**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARKPULSE, INC., | Index No.: 1:22-cv-00045-LGS |
| *Plaintiff*, | |
| v. | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| EMA FINANCIAL, LLC, EMA GROUP, LLC, and FELICIA PRESTON, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff DarkPulse, Inc. by and through its undersigned counsel, respectfully states as follows for its First Amended Complaint against Defendants EMA Financial, LLC, EMA Group, LLC, and Felicia Preston.[1]

## PRELIMINARY STATEMENT

1.  EMA is a "death spiral" or "toxic" lender:[2] an unregistered securities dealer that purchases convertible debt securities from small public companies (that are often struggling to raise capital) in order to get their hands on heavily-discounted stock.

2.  EMA maintains a robust toxic lending business.[3]

---

[1] The following terms are used herein:  Plaintiff DarkPulse, Inc. ("Plaintiff" or "DarkPulse"), Defendants EMA Financial, LLC ("EMA Lending Enterprise," "EMA Enterprise," or "EMA"), EMA Group, LLC ("EMA Group"), and Felicia Preston ("Preston," and, together with EMA Group, "EMA Managers") (collectively, "Defendants").

[2] *See* www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities (last accessed March 18, 2022); en.wikipedia.org/wiki/Death_spiral_financing (last accessed March 18, 2022).

[3] The webpage screenshot was obtained from the Internet Archive Wayback Machine, which reflects that the webpage was captured—and thus live—on September 19, 2015. *See* https://web.archive.org/web/20150919004218/http://www.emafin.com/ (last accessed Jan. 3, 2022) ("Webpage Screenshot").



EMA Financial, LLC is a private investment firm focused on providing creative financing solutions for public and private companies. Please contact us for more information.

3.      Toxic lenders like EMA are not the saviors of microcaps that they purport to be, nor is their business model legal.  Rather, as reflected in recent Securities and Exchange Commission ("SEC") prosecutions,[4] lenders like EMA avoid registering so they can evade regulatory oversight and make predatory loans that generate outrageous profits.

4.      The toxic lending business model is simple: unlike an investor or day trader, lenders like EMA use the convertible securities transaction to acquire the company's stock at a steep discount,[5] which it dumps into the public markets as soon as possible to reap the markup.  This massive selling invariably causes a catastrophic plunge in the stock price that leaves the company worse off than when it started.

5.      Using this business model from at least 2015 through the present, Preston and

---

[4] *See, e.g.*, *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, No. 20-cv-21254 ,2022 WL 196283(S.D. Fla. Jan. 21, 2022); *SEC v. Fierro*, No. 20-2104 (MAS)(DEA), 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. GPL Ventures, LLC*, No. 21-CV-6814 (S.D.N.Y. Aug. 13, 2021); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife,* 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021).
[5] The stock is generally obtained via one or more market-adjustable convertible securities required by the lender for making the loan; this may be the promissory note itself or a convertible preferred equity.

EMA[6] acquired and sold billions of newly-issued shares of microcap securities—and generated millions of dollars from those sales—at the same time failing to comply with the mandatory dealer registration requirements of federal securities laws.

6.      Indeed, between January 2015 and October 2021, Defendants converted and *sold over 11 billion shares of stock*, generating tens of millions of dollars in gross stock sale proceeds, with many other securities transactions through convertible notes and other market adjustable securities.

7.      By engaging in the regular business of buying convertible notes (securities) (*see* 15 U.S.C. § 78c(a)(10)) for their own account, converting the debt under the notes into newly-issued stock and then immediately selling that stock into the public market, Defendants operate as unregistered securities dealers.  *See* 15 U.S.C. § 78o.

8.      The Securities Contracts[7] in this case are a masterful example of toxic lending which enabled EMA to acquire approximately *$265,493.55 worth of stock* in exchange for a $90,000[8] loan, $53,397.02 of which is, according to EMA, still outstanding and unconverted.  This translates to an unfathomable *294.99% gain*.[9]

9.      The Securities Contracts are patently unlawful.  Among other things, they were made in violation of § 15(a) of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. § 78o.

---

[6] Based on a review of filings in the EDGAR database from 2015 to date, EMA has engaged in financing similar to this case on at least 195 separate occasions with at least 132 other microcap companies, resulting in approximately 395 securities transactions and sales of at least 11 billion shares worth tens of millions of dollars.

[7] "Securities Contracts" are defined as the documents executed by Plaintiff in favor of EMA on September 25, 2018. Specifically, the agreement is comprised by a Securities Purchase Agreement ("SPA"), attached hereto as **Exhibit 1**, and Convertible Promissory Note ("Note"), attached hereto as **Exhibit 2**, in the amount of $100,000 bearing an 8% annual interest rate on the face of the Note.  "DarkPulse Transaction" is defined as the transaction resulting in the execution of the Securities Contracts.

[8] Although the principal amount of the Note is $100,000, its purchase price was only $94,000 due to an original issue discount ("OID").  Further, because EMA withheld $4,000 for "Fees and Expenses", DarkPulse only received $90,000 worth of financing.  *See* SPA, at § 1.a, at 1, and § 10.d, at 15.

[9] This gain is calculated by using the fair market value of the shares on the date of the notice of conversion, see below.

10.     Accordingly, among other relief sought by Plaintiff is rescission of the Securities Contracts, including the return of all stock obtained by the Defendants via the Securities Contracts, pursuant to § 29(b) of the Act, on the grounds that each of the contracts was both ***made*** and ***performed*** in violation of § 15(a) of the Act.  *See* 15 U.S.C. § 78o.

11.     The Note charges DarkPulse a rate of interest that is criminally usurious under New York law.  As shown in greater detail below, the Note charges an annualized interest rate of **73% APR**, while the maximum rate of interest that may be charged in New York is 25 percent APR.  *See* N.Y. G.O.L. § 5-501; N.Y. Penal Law § 190.40.[10]

12.     Consistent with EMA's established business model, the Note provided EMA with a conversion option, that is, the right to take repayment by exchanging the accrued debt (or any portion thereof) for shares of company stock.  Consistent with its general practice, EMA does not exchange the debt on a dollar-for-dollar basis, but at a 30% discount to the market price at the time of conversion.

13.     EMA is an "enterprise" as defined in the Racketeer Influenced and Corrupt Organization Act ("RICO").  *See* 18 U.S.C. § 1961, *et seq.*

14.     EMA has engaged in the collection of unlawful debt at the direction and control of Defendants EMA Group and Felicia Preston, culpable "persons" as defined in RICO.  *See* 18 U.S.C. § 1961.

15.     EMA collected an unlawful debt from DarkPulse when it obtained stock pursuant to the conversion feature of the usurious Note.

16.     Accordingly, among other relief, DarkPulse seeks an award of treble damages under RICO, because the amount of interest charged by EMA in the Note is more than double the

---

[10] *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612 (N.Y. 2021).

maximum enforceable rate of interest allowed by New York law, and EMA conducts a business of making usurious loans

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Act.

18.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

19.     Venue is proper in this District pursuant to 27 U.S.C. § 1391(b)(1) and (2), because a substantial part of the events giving rise to this action occurred in this District as Defendants operated their business out of this District.

20.     Venue is also proper because the governing law provision on the Securities Contracts explicitly state that any action brought by either party against the other concerning the transactions must be brought only in the civil or state courts of New York or in the federal courts located in the State and County of New York.

## PARTIES

21.     DarkPulse is a corporation duly organized under the laws of the State of Delaware, with its principal place of business and headquarters located at 1345 Avenue of the Americas, 2nd Floor, New York, NY 10105.

22.     DarkPulse's stock trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies—too small for the major Exchanges—are traded.

23.     EMA is a limited liability company organized under the laws of the State of Delaware, with its principal place of business and headquarters located at 40 Wall Street, 17th Floor, New York, NY 10005.

24.     EMA is not now, and has never been, registered as a securities dealer with the SEC.

25.     Upon information and belief, EMA Group is a limited liability company duly organized under the laws of the State of Delaware, with its principal place of business and headquarters located in the state of New York at 40 Wall Street, 17th Floor, New York, NY 10005.

26.     EMA Group is not now, and has never been, registered as a securities dealer with the SEC.

27.     Upon information and belief, EMA Group is the investment manager of EMA.

28.     Upon information and belief, EMA Group is wholly owned and controlled by Preston.

29.     Defendant Preston, upon information and belief, is a permanent resident, domiciled, and therefore a citizen of, the State of New York.

30.     Upon information and belief, Preston is the managing member of EMA Group, and at all relevant times has possessed the power and authority to, directly or indirectly, control EMA's statements, representations, and decisions due to her power and authority to directly, or indirectly, control EMA Group.

31.     Preston was registered as a broker with the Financial Industry Regulatory Authority, Inc. ("FINRA") between August 2011 and November 2012.  Her license as a broker was terminated in November 2012.

## FACTUAL ALLEGATIONS

### I.     THE EMA LENDING ENTERPRISE

32.     The EMA Lending Enterprise exists to lend money for profit using the business model described herein.

33.     Upon information and belief, the EMA Lending Enterprise has made loans to other

issuers that also violate New York's usury laws—in the same manner as the Loans in this case.

## II.   THE DEFENDANTS' GENERAL BUSINESS MODEL

### *The Defendants Target Financially-Strapped Issuers in Need of Capital*

34.     As mentioned above, EMA operated a website on which it held itself out to the public as a "private investment firm … focused on providing creative financing solutions for public and private companies."  *See* Webpage Screenshot.

35.     EMA uses "finders" to connect with potential company-borrowers.  *See EMA Financial, LLC v. Joey New York, Inc. et al*, No. 17-CV-9706 (VSB), ECF No. 170 (Official Trial Transcript) at 60-62 (S.D.N.Y. July 13, 2021) ("EMA Transcript") (describing a "David Fromer," who received compensation in the form of a percentage from the convertible note for serving as a "broker" who facilitated EMA's introduction to the borrowing issuer).

36.     Upon information and belief, because the issuers in Defendants' convertible note transactions often had minimal assets, inconsistent or negative cash flow from operations, and/or unstable operating histories, these companies usually were unable to obtain financing from banks. Therefore, Defendants carefully positioned themselves to take advantage of these issuer's poor financial conditions and were able to negotiate highly favorable terms governing the deals with the financially-strapped issuers.

### *Defendants Purchase Convertible Promissory Notes With Favorable Terms In Order to Obtain Shares of Stock*

37.     Upon information and belief, Defendants obtained all of the stock they sold as part of their business directly from the issuers through note conversions, as opposed to purchases in the

open market, like a "trader."[11]  The billions of shares that Defendants obtained through their deals with issuers were newly-issued, and their later sales of those shares in the market significantly increased both the amount of shares in the hands of the public and the issuers' outstanding share totals.  Selling into the public market large quantities of newly-issued shares obtained directly from issuers is a common hallmark of a securities dealer.

38.     In addition to profiting from the spread made available by Defendants' prompt sales following a conversion, the Defendants realized additional financial gains by negotiating additional favorable terms, such as reserving an OID and prepayment penalties, and imposing hidden "fees." *See* SPA, at 1, § 1(a).

39.     Upon information and belief, the Defendants usually charged issuers "legal," "transactional" "due diligence," or "administrative" fees for entering into the notes, generally ranging from $1,000.00 to $5,000.00 for most deals.  Defendants typically directed that the transactional fees be included as a reduction to the purchase price of the note and either withheld by or paid to EMA.  *See* SPA, at 15, § 10(d).  Altogether, Defendants collected no less than $18,650.90 in so-called transaction "fees" from Plaintiff.

### *Defendants Converted Promissory Note Debt Into Newly Issued Shares of Common Stock at a Substantial Discount*

40.     EMA does not acquire stock traded on the open markets.  *See* EMA Transcript at 51.

41.     Instead, EMA always acquires newly issued shares of common stock that have never been traded before directly from the issuer.

---

[11] The trader exception refers to the exemption provided by Section 3(a)(5)(B) of the Act, which states that a "dealer" is not "a person that buys or sells securities … for such person's own account, either individually or in a fiduciary capacity, *but not as a part of a regular business*." 15 U.S.C. § 78c(a)(5)(B) (emphasis added).  Further distinguishing a dealer from a trader is that dealers acquire stock directly from the issuer, whereas traders purchase stock in the marketplace.  *See SEC v. River North*, 415 F.Supp.3d 853, 859 (N.D. Ill. 2019).

42.     SEC Rule 144, a safe harbor from the statutory definition of an underwriter, was adopted to establish criteria for determining whether a person was engaged in the distribution of securities.  Under Rule 144, non-affiliates who acquire restricted stock directly or indirectly from the issuer in a private transaction may be able to resell it free of restriction into the market after observing a holding period.  *See* 17 C.F.R. § 210.144.

43.     Upon information and belief, Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144.  For that reason, Defendants generally waited either six months after purchasing a convertible note before they began to convert the note into newly-issued stock and then sell that stock into the public market.

44.     The convertible notes that Defendants bought and/or solicited from the issuers allowed Defendants to acquire *no less than 11 billion shares of newly-issued stock* at a substantial discount—typically between 30 to 50 percent below the sale price for issuer's common stock during the twenty (20) days preceding the date of the conversion request.

45.     Nearly all of EMA's notes impose additional default penalties on issuers if EMA encountered difficulty depositing the stock with brokerages, or if the issuer committed one of approximately 20 events of default as defined in either the Note or SPA.

46.     Similarly, the Defendants' notes included draconian prepayment provisions that discouraged and penalized the issuer for paying off the notes ahead of schedule, thereby ensuring Defendants ample time to convert the maximum amount of debt into stock.

47.     After holding the convertible debt acquired in a convertible note deal for the applicable holding period contained in Rule 144, Defendants sent conversion notices to the issuers and their transfer agents, identifying the amount to be converted and the corresponding shares to be issued to Defendants.

48.     Upon information and belief, instead of converting all of the debt into stock all at once, Defendants usually sent multiple conversion notices for each convertible note.  Among other reasons, Defendants incrementally converted debt into stock and sold said stock over a period of time to purposefully avoid owning more than five percent of any class of an issuer's publicly traded stock.  Far from an investment strategy, Defendants' incremental conversion and sales were purposefully timed so that Defendants could attempt to evade the requirement to file a "beneficial ownership report" (SEC Schedule 13D) with the SEC.

49.     Upon information and belief, Defendants arranged for the converted stock to be transferred to EMA's brokerage accounts as quickly as possible to ensure maximum profits and to capitalize on the conversion discount, often paying expediting fees.  As part of this process, Defendants obtained rather elusive and oftentimes inaccurate attorney opinion letters to assure brokerage firms that the converted stock was not restricted and could be resold to the public.

### *Defendants Sell the Converted Stock into the Public Market*

50.     Once brokers deposit the converted shares from the issuers into EMA's brokerage accounts, Defendants usually begin selling the shares into the public marketplace immediately to lock in their profits.  *See* EMA Transcript at 68.

51.     Preston personally, or through an affiliated person, entity or independent contractor acting at her direction, used the telephone and the internet to place sell orders.  Sales were made through brokers.

52.     However, Defendants generally only sold as much as the market would bear, often staggering their sales over a period of time instead of all at once.

53.     Defendants' practice was to sell the shares they had acquired in a conversion continuously on a daily or near-daily basis until they had sold all of their shares into the market.

***Defendants Earn Significant Profits From***
***Selling Discounted Shares of Stock***

54.     Upon information and belief, Defendants reaped large profits from their unregistered dealer activity, the majority of which resulted from reaping the difference between the market prices they received when they sold the stock to the public, and the deeply discounted prices at which they acquired shares from the issuers.  This mechanism, which gave Defendants a profit on spread or markup on the stock that they sold, is a common attribute of a securities dealer.

55.     Between January 2015 and August 2021, Defendants *purchased no less than 195 convertible promissory notes* (securities) and converted the same into *no less than 11 billion shares of newly-issued shares of stock* that Defendants subsequently sold on the secondary market for tens of millions of dollars.

56.     During this same timeframe, Defendants generated tens of millions of dollars in gross stock sale proceeds, with many other securities transactions still outstanding.  The majority of the profits came from the spread between Defendants' discounted purchase price at conversion (per the terms of the applicable note) and prevailing market pricing.

57.     The following are examples of transactions during the relevant period in which Defendants acquired convertible notes from penny stock issuers, exercised their conversion right, and, upon information and belief, promptly sold the newly-issued stock into the market for a significant profit:

> a.   Probability Media Corp. (PBYA): Defendants purchased a note for approximately $156,412.00, which they converted into more than 322,377,107 shares of stock, with an estimated fair market value of $302,821.05;
>
> b.   Phi Group, Inc. (PHIL): Defendants purchased a note for $100,000.00,

which they converted into more than 6,864,927,340 shares of stock, with an estimated fair market value of $16,916,953.10; and

c.   Blue Sphere Corp. (BLSP) Defendants purchased a note for $125,000.00, which they converted into more than 9,486,800 shares of stock with an estimated fair market value of $490,574.96.

58.   In addition to the above transactions, Defendants have engaged in *no fewer than 395 securities transactions* with *no fewer than 132 issuers* since January 2015.

59.   Upon information and belief, Defendants used the proceeds from the sales of the shares to fund their regular business of purchasing additional convertible promissory notes.

60.   The Defendants' business model—as reflected in the conduct alleged above—manifests numerous and substantial characteristics of dealer activity, consistent with ongoing SEC prosecutions and other Federal court decisions.

61.   Chief among these characteristics is reaping profits from the purchasing of convertible notes, converting the debt into newly-issued shares of common stock at a substantial discount, and selling the stock to reap the profits for Defendants' own account.

*Defendants Continue to Convert and Sell Shares of Stock*

62.   Defendants continue to purchase new convertible notes, convert debt into stock from transactions with other microcap stock issuers, and then sell those shares into the market.  In 2021 alone, Defendants purchased no fewer than six convertible notes and three warrants, and converted and sold *5,974,833,000* shares of stock.

### III.     DEFENDANTS' BUSINESS MODEL AS APPLIED TO PLAINTIFF

*The Agreements Are Usurious and*
*Unenforceable Under New York Law*

63.     The Securities Contracts state that they are governed by New York law.[12]

64.     The Securities Contracts in this case were executed between EMA and DarkPulse in September 2018.  Under those contracts, EMA purchased from DarkPulse a so-called "market-adjustable" convertible promissory note in the amount of $100,000.  The Note carried a stated interest of 8% APR and a nine-month maturity date.

65.     Pursuant to its typical business model, the Securities Contracts provided EMA a conversion option, that is, an option to take repayment by exchanging the debt for shares of company stock.  As was its practice, EMA would not exchange the debt on a dollar-for-dollar basis, but at a substantial discount to the market price at the time of conversion—in this case, at a 30% discount.  Hence, the Securities Contracts, on their face, ensured that for every 100 dollars of debt converted, EMA obtained a minimum of $143 in stock.

66.     The New York Court of Appeals has recently concluded that for securities of this type, the value conveyed by the conversion discount must be included in the interest calculation for purposes of New York's usury laws.[13]

67.     Because EMA withheld $4,000 for "Fees and Expenses", the 6% Original Issue Discount ("OID") is considered interest under New York law.  *See* SPA at § 1.a, § 10.d.

68.     When the (minimum) gains guaranteed by the conversion discount are added to the stated 8% rate and 6% original issue discount, the total interest EMA charged under the Securities

---

[12] *See* Note at 13, § 10(a).
[13] *Adar Bays*, 179 N.E.3d at 614-15.

Contracts comes out to *73% APR*,[14] rendering the Securities Contracts in violation of the maximum 25% interest rate cap set forth in the criminal usury laws. *See* N.Y. Penal Law § 190.40.

69.     The transaction between Defendants and DarkPulse in this case violated New York criminal usury laws and is unlawful, and void *ab initio*.

70.     Further, the transaction between Defendants and DarkPulse in this case violated federal securities laws, because EMA, an unregistered securities dealer, was prohibited from entering into a contract transacting in securities.[15]  Hence, the Securities Contracts were unlawful as made.

### *Defendants Converted the Note (a Security) to Stock (Securities) Pursuant to the Note with Plaintiff*

71.     Starting on April 17, 2019—only weeks after the expiration of the Rule 144 holding period for the Note—EMA submitted 19 separate conversions ("Related Transactions") under the Note, pursuant to which EMA received 567,242,000 newly-issued shares of DarkPulse stock.

72.     Each of the 19 conversions constitutes *a separate purchase and sale* of securities, and constitutes a transaction in securities as defined in Section 15(a) of the Act.

73.     Pursuant to those 19 conversions, EMA converted a total of $83,244.18 of debt (principal plus stated interest).   Based on the average daily trading price on the day the corresponding conversion notice was submitted, the estimated open market value of the 567,242,000 newly-issued DarkPulse securities received by EMA pursuant to the conversions is approximately *$265,493.55—approximately 3.19 times the aggregate amount of debt that EMA converted.*

---

[14] Calculated as 30/70 = .428 or .43 (Conversion discount) + .06 (OID) = .49 x 12/9 = .65 or 65% APR + 8% APR (stated interest) = Total 73% APR.
[15] "The term security means any note, stock, treasury stock…"  *See* § 78c.

74.     As mentioned above, Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144 and thereby began converting almost immediately after the expiration of the holding period as follows:

a.   on April 17, 2019, Defendants converted $4,950.00 of debt to 3,000,000 shares;

b.   on May 1, 2019, Defendants converted $6,050.00 of debt to 5,000,000 shares;

c.   on May 8, 2019, Defendants converted $4,867.50 of debt to 5,900,000 shares;

d.   on May 14, 2019, Defendants converted $5,280.00 of debt to 6,400,000 shares;

e.   on May 22, 2019, Defendants converted $5,610.00 of debt to 6,800,000 shares;

f.   on June 4, 2019, Defendants converted $5,076.00 of debt to 7,100,000 shares;

g.   on June 10, 2019, Defendants converted $5,148.00 of debt to 7,800,000 shares

h.   on June 19, 2019, Defendants converted $3,580.50 of debt to 9,300,000 shares;

i.   on June 25, 2019, Defendants converted $3,498.00 of debt to 10,600,000 shares;

j.   on July 1, 2019, Defendants converted $3,217.50 of debt to 11,700,000 shares;

    k.  on July 11, 2019, Defendants converted $3,602.50 of debt to 13,100,000 shares;

    l.  on July 18, 2019, Defendants converted $3,987.50 of debt to 14,500,000 shares;

    m.  on July 24, 2019, Defendants converted $3,344.00 of debt to 15,200,000 shares;

    n.  on August 1, 2019, Defendants converted $3,960.00 of debt to 18,000,000 shares;

    o.  on August 12, 2019, Defendants converted $2,442.00 of debt to 18,500,000 shares;

    p.  on September 4, 2019, Defendants converted $3,465.00 of debt to 31,500,000 shares;

    q.  on September 30, 2020, Defendants converted $6,320.00 of debt to 158,000,000 shares;

    r.  on October 7, 2020, Defendants converted $5,740.76 of debt to 143,519,000 shares; and

    s.  on October 22, 2020, Defendants converted $3,104.92 of debt to 77,623,000 shares.

75.    Each conversion of debt into stock identified above constitutes a separate securities transaction.

### Defendants Quickly Sold Plaintiff's Stock (Securities) It Would Acquire through Conversion

76.    Investment is not part of EMA's business model.

77.    EMA relied on its conversion discount to maximize profits while it drove down

DarkPulse's trading price due to the liquidation of its sizable positions.

78.     EMA's business model is similar to the one used by the defendants in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2016), *Almagarby*, and *Keener*.

79.     Upon information and belief, as soon as EMA received the newly-issued DarkPulse shares, it immediately sold them into the marketplace to reap a substantial profit—even while DarkPulse's trading price was falling.

80.     Defendants were very active sellers once they acquired stock.  For example, in 2019, shortly after every conversion, Defendants appear to have actively sold DarkPulse stock. As reflected in the table below, DarkPulse's average daily volume significantly increased for the days following the date of a conversion particularly in comparison to days prior to the issuer's toxic death spiral (*i.e.*, before mass conversions began flooding the market with newly-issued shares), which inevitably occurred due to the massive selling of the shares Defendants acquired through conversion:

| DarkPulse's Trading Volume Analysis | | | | | | |
|---|---|---|---|---|---|---|
| Average Volume for 30-Day Period Preceding 04/17/19 Convers'n Notice under First Note | Average Volume 10-Day Period Succeeding 4/17/2019 Notice of Convers'n | Average Volume 10-Day Period Succeeding 5/01/19 Notice of Convers'n | Average Volume 10-Day Period Succeeding 05/08/19 Notice of Conversion | Average Volume 10-Day Period Succeeding 05/14/19 Notice of Conversion | Average Volume 10-Day Period Succeeding 05/22/19 Notice of Convers'n | Average Volume 10-Day Period Succeeding 06/04/19 Notice of Conversion |
| 255,068 | 930,807 | 7,050,532 | 4,212,047 | 2,371,476 | 2,513,877 | 8,631,063 |

*Defendants Violated the Federal Securities*
*Laws by Acting as Unregistered Dealers*

81.     EMA's purchases of convertible notes (securities transaction), conversions of debt into stock (securities transaction), and subsequent stock sales (securities transaction) are part of an ongoing business.  EMA acquires large volumes of shares privately from issuers at a substantial discount to market, sells large volumes of shares back into the open market for substantial profit due to the conversion discount, and always does so absent investment intent.  EMA does all of this—buys, converts, and sells securities—as part of its regular business for its own account.

82.     The SEC's EDGAR database shows that since 2015, EMA has purchased similar convertible securities on more than 195 occasions, from at least 133 other microcap companies.

83.     Upon information and belief, EMA made use of the mails, email, and other instrumentalities of interstate commerce to effect the securities transactions under the Securities Contracts.  For example, Defendants used the internet to solicit penny stock issuers, transferred cash through wire transfers, and used email and telephone communications to negotiate and effectuate sales transactions through their brokers.

84.     Defendants paid several independent contractors to assist them in locating, negotiating, and managing EMA's transactions.

85.     By failing to comply with the dealer registration requirements and federal securities laws, EMA purposefully "operated under the radar" to avoid important regulatory obligations that govern dealer conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

86.     In light of the difficulty of assessing damages, the equitable remedy of rescission

indicated by Section 29(b) of the Act,[16] voiding and rescinding the Securities Contracts (to return the parties to their pre-contract position) should be effectuated by mandating EMA to return to DarkPulse every share of stock it acquired under the Note (or the cash equivalent thereof) with an aggregate value of $265,493.55, less the net sum provided to the Plaintiff for the purchase of the Note.

87.     DarkPulse is further entitled to statutory prejudgment interest on the value of the stock and the cash payments.

88.     In the alternative, EMA should pay rescissionary damages in an amount constituting the full market value of the stock wrongfully acquired and cash amounts received, both with statutory prejudgment interest.

89.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer.  *See* § 78o(a)(1).

90.     While Defendants engaged in this conduct, they were not registered with the SEC as dealers or associated with dealers registered with the SEC.

91.     The dealer registration requirements provide important safeguards for the investing public, shareholders and companies.  The excessive compensation and patently unfair terms used in the Agreements (and EMA's transactions with other issuers) would have violated FINRA Rules 5110(b) and 5110(c)(2)(A), and thus could not have been effected by a registered securities dealer.

92.     Registration as a securities dealer and accompanying SEC oversight would further

---

[16] *See also Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970), wherein the United States Supreme Court held that there is a private right of action for rescission based on a violation of the Act.

prevent EMA from utilizing Rule 144 tracking provision (17 C.F.R. 230.144(d)(3)(ii)) because EMA's business operations constitute underwriting activity, or sales with a view to distribution.

### *The EMA Managers Controlled the EMA Lending Enterprise in its Convertible Debt Securities Business*

93.     At all relevant times, Preston possessed and exercised the ultimate decision-making and control over EMA, including the power to decide whether to enter into each of the securities transactions (including the Note with Plaintiff), to negotiate and approve the final deal terms, and to monitor the status of EMA's investments and its sales of stock.

94.     Preston, as the sole owner of EMA Group, had sole and exclusive control and final decision-making authority over EMA.

95.     Preston personally, or others employed by EMA, at Preston's direction, negotiated the terms of the convertible notes that EMA purchased from penny stock issuers (including the Note with Plaintiff), as well as amendments to the original terms.  Preston also signed the contracts by which EMA acquired the convertible notes, including the Note with Plaintiff.

96.     Preston, based on her previous experience as a registered broker, knew EMA was required to register as a dealer due to its dealer activity and intentionally decided not to direct EMA to register as a dealer.

97.     Despite her familiarity with the laws, regulations, and rules concerning the securities markets and its participants, Preston possessed and exercised control over EMA's actions, including without limitation EMA's dealings in securities.

98.     Ultimately, Preston was and remains the sole person with the power to direct, authorize, and compel EMA to enter into, convert, and subsequently sell securities through convertible notes with issuers, including the Note with DarkPulse.

99.     At all times relevant hereto, the EMA Managers intended to engage in the unlawful

conduct herein alleged, with actual knowledge of the illegal activities.

### *The Note Evidences the Creation of*
### *an Unlawful Debt, Subsequently Collected in*
### *Violation of RICO, 18 U.S.C. § 1962, et seq.*

100.   Because the Note charges a 73% APR, which is more than double the maximum enforceable rate of interest allowed by New York law, EMA has engaged in the collection of unlawful debt under RICO.

101.   The Note evidences an unlawful debt under RICO because each one charges more than twice the enforceable rate under New York law, and EMA is in the business of making usurious loans.  *See* 18 U.S.C. § 1961(6); N.Y. Penal Law § 190.40.

102.   The New York Criminal Usury Statute provides:

§ 190.40. Criminal usury in the second degree

A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

103.   The Note is a loan agreement that must comply with New York's usury laws.

104.   Pursuant to the express terms of the Note, EMA had the right to convert the debt into DarkPulse stock as repayment for the loan, but at a substantial 30% discount to the market price at the time of conversion.

105.   The value of a fixed conversion discount is interest that must be included in the interest calculation for purposes of a usury analysis in New York.  *See Adar Bays, supra,* at 37 N.Y.3d at 338.

106.   The Note is governed by the laws of the State of New York.  *See* Note at § 4.6. Pursuant to New York's usury laws, the maximum enforceable legal rate for a loan to a corporation

is 25% APR.[17] *See* Penal Law § 190.40; Gen. Oblig. Law § 5-501, *et. seq.*

107.    Although the Note imposes a stated interest rate of 8% per annum, the added value conferred by the fixed 30% conversion discount produces an estimated interest rate of 73% APR—nearly three times  the maximum enforceable rate permitted by New York's criminal usury law (25%).

108.    As demonstrated by the many additional convertible note transactions with other issuers alleged above, which are governed by New York law and exact a rate of interest that is clearly usurious, EMA is engaged in the business of lending money at a usurious rate.

### DarkPulse was Harmed by the Unlawful Debt Collection

109.    As a result of the unlawful debt collection, DarkPulse has been injured in its business and property.

110.    As a result of the unlawful debt collection, EMA obtained tens of millions of shares of free-trading DarkPulse common stock to which they were not entitled or capable of lawfully receiving.

111.    The excessive conversions and resulting issuances forced DarkPulse to increase its outstanding shares, thereby massively diluting DarkPulse's stockholders.

112.    Once EMA began converting under the Agreements, its immediate and massive selling of large blocks of newly-issued shares of DarkPulse's common stock into the public market caused enormous depression in DarkPulse's market capitalization and stock price.

113.    As a result of these actions, DarkPulse became unable to privately raise money from other entities, with other toxic lenders becoming the only reasonably available option for short-

---

[17] In addition to the Note, many, if not all, of the other convertible promissory notes entered into by EMA with other securities issuers imposed substantially similar terms including a New York choice of law provision and a steep conversion discount to market.

term financing, leading to more losses.

114.    All of the foregoing harm was foreseeable by EMA, and was proximately caused by EMA's collection of an unlawful debt as alleged herein.

115.    Assessment of the total damage caused by these actions to DarkPulse is difficult to quantify and will be determined at trial.

## CAUSES OF ACTION

### COUNT I:

*Rescission Pursuant to Section 29(b) of the Act for Violation Section 15(a) of the Act by EMA for Effecting (Making) the Securities Contracts as an Unregistered Dealer*
(Against All Defendants)

116.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-115 as though set forth herein.

117.    Section 29(b) of the Exchange Act provides in relevant part that:

**Every contract *made* in violation of any provision of this chapter or of any rule or regulation thereunder … shall be void** (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or … engaged in the performance of any such contract…

§ 78cc(b) (emphasis added).

118.    The Securities Contracts were made in violation of Section 15(a) of the Act (§ 78o(a)(1)), which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

119.    EMA is a securities dealer within the meaning of the Act.  *See* § 78c(a)(5).

120.    EMA is not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act (§ 78o(a)(1)).

121.    EMA effected transactions in securities in the DarkPulse Transaction and in the

Related Transactions.

122.    EMA used the means of interstate commerce to effectuate the DarkPulse Transaction and in the Related Transactions.

123.    As a party to the Securities Contracts and the Related Transactions, DarkPulse is in contractual privity with EMA.

124.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, DarkPulse, as an issuer, is within the class of persons that the Act was designed to protect.

125.    Because EMA effected the DarkPulse Transaction and the Related Transactions in securities as an unregistered dealer, and utilized the means of interstate commerce in connection therewith, the Securities Contracts were unlawful when made.

## COUNT II:

*Rescission Pursuant to Section 29(b) of the Act for Violation of Section 15(a) the Act by Unlawfully Transacting in Securities in Performance of the Securities Contracts as an Unregistered Dealer*
(Against All Defendants)

126.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-115 as though set forth herein.

127.    Section 29(b) of the Exchange Act provides in relevant part that:

**Every contract** … (including any contract for listing a security on an exchange) heretofore or hereafter made, ***the performance of which* involves the violation of**, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, **shall be void** (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or … **engaged in the performance of** any such contract…

§ 78cc(b) (emphasis added).

128.    The Securities Contracts were performed in violation of Section 15(a) of the Act

**24**

(§ 78o(a)(1)), which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

129.    EMA is a securities dealer within the meaning of the Act.  *See* § 78c(a)(5).

130.    EMA is not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act (§ 78o(a)(1)).

131.    EMA effected transactions in securities in the DarkPulse Transaction and in the Related Transactions.

132.    EMA used the means of interstate commerce to effectuate the DarkPulse Transaction and the Related Transactions.

133.    As a party to the Securities Contracts and the Related Transactions, DarkPulse is in contractual privity with EMA.

134.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, DarkPulse, as an issuer, is within the class of persons that the Act was designed to protect.

135.    Because EMA effected the DarkPulse Transaction and the Related Transactions in securities as an unregistered dealer, and utilized the means of interstate commerce in connection therewith, the Securities Contracts were unlawful when performed (via the conversions).

### COUNT III:

*Violation of Section 20(a) of the Act by Preston
as a Control Person of EMA Based on EMA's
Transactions in Securities as an Unregistered Dealer*
(Against Defendant Preston)

136.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-115 as though set forth herein.

137.    Preston had the power and authority to cause EMA to engage in the wrongful

conduct described in the First and Second Claims for Relief herein.

138.    Preston did in fact cause EMA to engage in the wrongful conduct described herein in paragraphs 1-135 (including Counts I and II).

139.    Preston did not act in good faith.

140.    Preston directly and/or indirectly induced the acts and conduct that constitute the violations in this case.

141.    Therefore, Preston acted as a control person of EMA within the meaning of § 20(a) of the Act (15 U.S.C. § 78t).

## COUNT IV:

*Conducting the Affairs of the*
*RICO Enterprise (RICO, § 1962(c))*
(Against All Defendants)

142.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-115 as though set forth herein.

143.    Each of the EMA Managers is a RICO culpable "person" within the meaning of 18 U.S.C. § 1961(3):  an individual or entity capable of holding a legal or beneficial interest in property.

144.    The EMA Enterprise is an "enterprise" within the meaning of RICO, 18 U.S.C. §1962(c).

145.    The EMA Managers agreed to and did conduct and participate in the conduct of the Enterprise's affairs through the collection of unlawful debt from DarkPulse by collecting and attempting to collect debt unenforceable under New York usury laws, having been incurred by a loan by the enterprise that charges, takes or receives interest at more than double the maximum legal rate.

146.    Upon information and belief, pursuant to and in furtherance of their scheme, the Defendants enterprise is in the business of making loans at usurious interest rates, and thereby committed multiple related acts of unlawful debt collection from a plethora of other desperate public companies throughout the country.

147.    The EMA Managers have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the collection of unlawful debt described above, in violation of 18 U.S.C. § 1962(c).

148.    The unlawful conduct violating § 1962(c), including the collection of unlawful debt, was accomplished in this case through the use of the telephone and the Internet, and/or other instrumentalities of interstate commerce, as alleged herein.

149.    As a direct and proximate result of the Defendants' unlawful debt collection and violations of 18 U.S.C. § 1962(c), DarkPulse has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Defendants, and it has suffered further damage and injury to be determined at trial.

**COUNT V:**

*Unjust Enrichment*
(Against All Defendants)

150.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-149 (including Counts I-IV) as though set forth herein.

151.    The Defendants have received valuable benefits from DarkPulse, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of DarkPulse common stock.

152.    These benefits are the result of the wrongful conduct alleged herein in Counts I-IV.

153.     These benefits are a result of EMA's enforcement of a patently usurious and unlawful contract that violates New York Penal code.

154.     By charging an effective interest rate in excess of 25% APR, EMA violated section 190.40 of the New York Penal code, a class E felony.

155.     The Defendants have unjustly retained these benefits of committing a class E felony at DarkPulse and its stockholders' expense.

156.     The Defendants have unjustly retained the benefits of having violated federal securities laws at DarkPulse and its stockholders' expense.

157.     As a result, the Defendants have been unjustly enriched.

## COUNT VI:

### *Constructive Trust*
(Against All Defendants)

158.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-157 (including Counts I-V) as though set forth herein.

159.     As alleged in Count V, the Defendants have been unjustly enriched by DarkPulse.

160.     The circumstances are such that it would be fundamentally unjust and inequitable for the Defendants to retain the property conferred on them by DarkPulse.

161.     DarkPulse has a specific, identifiable interest in the property unjustly retained by the Defendants as a result of the Securities Contracts.

162.     The Defendants have wrongfully acquired and detained DarkPulse's property obtained via the Securities Contracts.

163.     Allowing the Defendants to retain the property conferred on them by DarkPulse would inequitably allow the Defendants to profit from their own wrongdoing, and to dispose of said property for their own purposes including without limitation paying their attorney's fees and

costs in connection with this action, and engaging in additional unlawful transactions of the type giving rise to this action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff seeks a Verdict and Judgment against the Defendants herein as follows:

A. Count I (Against all Defendants):

    a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

        i. The Securities Contracts and Related Transactions are transactions in securities within the meaning set forth in the Act, 15 U.S.C. § 78c(a);

        ii. EMA is operating as an unregistered dealer in securities, in violation of the Act, 15 U.S.C. § 78o;

        iii. The Securities Contracts are void and subject to rescission under the Act, 15 U.S.C. § 78cc; and

        iv. EMA is entitled to retain the principal amount of the loan made pursuant to the Securities Contracts, already repaid to EMA.

    b. DarkPulse requests that this Court enter an Order:

        i. Rescinding the Securities Contracts pursuant to the Act, 15 U.S.C. § 78cc;

        ii. Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and recission of the Securities Contracts;

        iii. Requiring EMA to return to DarkPulse, all DarkPulse stock obtained via the Note;

    iv.    Requiring EMA to return to DarkPulse the amount of $265,493.55, the value of the shares that were wrongfully conveyed under the unlawful contract less the principal amount provided by EMA thereby preventing DarkPulse from being unjustly enriched; and

    v.    Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the note.

B.  Count II (Against all Defendants):

    a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

        i.    The Securities Contracts and related transactions are transactions in securities within the meaning set forth in the Act, 15 U.S.C. § 78c(a);

        ii.    EMA is operating as an unregistered dealer in securities, in violation of the Act, 15 U.S.C. § 78o;

        iii.    The Securities Contracts are void and subject to rescission under the Act, 15 U.S.C. § 78cc; and

        iv.    EMA is entitled to retain the principal amount of the loan made pursuant to the Securities Contracts, already repaid to EMA.

    b.  DarkPulse requests that this Court enter an Order:

        i.    Rescinding the Securities Contracts pursuant to the Act, 15 U.S.C. § 78cc;

        ii.    Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and recission of the Securities Contracts;

        iii.    Requiring EMA to return to DarkPulse, all DarkPulse stock obtained via

Note;

    iv. Requiring EMA to return to DarkPulse the amount of $265,493.55, the value of the shares that were wrongfully conveyed under the unlawful contract less the principal amount provided by EMA thereby preventing DarkPulse from being unjustly enriched; and

    v. Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the note.

C. Count III (Against Defendant Preston):

    a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

        i. Preston had the power and authority to cause EMA to engage in the wrongful conduct described in the First and Second Claims for Relief herein;

        ii. Preston did in fact cause EMA to engage in the wrongful conduct described in First and Second Claims for Relief herein; and

        iii. Preston acted as a control person of EMA within the meaning of Section 20(a) of the Act (15 U.S.C. § 78t(a)).

    b. DarkPulse requests that this Court enter an Order, pursuant to Section 20(a) of the Act (15 U.S.C. § 78t(a)), holding Preston jointly and severally liable with and to the same extent as EMA is liable to DarkPulse under First and/or Second Claims for Relief herein.

D. Count IV (Against All Defendants)

    a. DarkPulse requests that this Court enter a Judgment against all the

Defendants as follows:

    i.      awarding DarkPulse compensatory, direct, and consequential damages;

    ii.      awarding DarkPulse treble damages as a remedy for the economic injury sustained by the Defendants' collection of unlawful debt;

    iii.      awarding DarkPulse its attorneys' fees and costs associated with this litigation;

    iv.      entering an award of monetary damages jointly and severally against the Defendants; and

    v.      awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

E. Count V (Against All Defendants):

    a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests this Court to declare that:

        i.      Defendants have voluntarily accepted and retained the property conferred by DarkPulse on the Defendants through and as a result of violations of the Act (15 U.S.C. § 78o); and

        ii.      the circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by DarkPulse without first paying the value thereof to DarkPulse, to prevent the Defendants from being unjustly enriched.

    b.  DarkPulse requests that this Court enter an Order requiring the Defendants to return to DarkPulse the value of the property they have unjustly retained in the amount of

$265,493.55, less the value conferred upon DarkPulse.

F.  Count VI (Against All Defendants):

   a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse
       requests this Court to declare that:

      i.   Defendants have voluntarily accepted and retained the property conferred
           by DarkPulse on the Defendants through and as a result of violations of the
           Act (15 U.S.C. § 78o); and

      ii.  the circumstances are such that it would be inequitable for the Defendants
           to retain the property conferred on them by DarkPulse without first paying
           the value thereof to DarkPulse, to prevent the Defendants from being
           unjustly enriched.

   b.  DarkPulse requests that this Court enter an Order imposing a constructive trust on
       DarkPulse property in possession of the Defendants as a result of the property
       conferred on them by DarkPulse.

G.  As to each of the foregoing Counts I through VI, to the extent permitted by applicable law,
    and not otherwise requested, DarkPulse requests that the Court enter an Order:

   a.  Awarding DarkPulse compensatory, direct, and consequential damages;

   b.  Awarding DarkPulse punitive and/or treble damages to deter the Defendants from
       continuing to engage in the same wrongful and unlawful transactions;

   c.  Awarding DarkPulse attorney fees and costs associated with this litigation;

   d.  Entering any award of monetary damages jointly and severally against the
       Defendants;

   e.  Awarding such further and additional legal and equitable relief that the Court deems

just, proper, and in the interest of justice.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues properly so tried.

DATED: March 28, 2022

Respectfully submitted,

**THE BASILE LAW FIRM P.C.**

By:  _/s/ Eric Benzenberg_
Eric J. Benzenberg, Esq.
Gustave P. Passanante, Esq.
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:    (516) 455-1500
Fax:     (631) 498-0748
Email:  eric@thebasilelawfirm.com
          gus@thebasilelawfirm.com
_Attorneys for Plaintiff DarkPulse, Inc._