## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DARKPULSE, INC., | Index No.: 1:22-cv-00045-LGS |
| *Plaintiff*, | |
| v. | |
| EMA FINANCIAL, LLC, EMA GROUP, LLC, and FELICIA PRESTON, | |
| *Defendants*. | |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**THE BASILE LAW FIRM P.C.**

Gustave P. Passanante, Esq.
Eric J. Benzenberg, Esq.
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:   (516) 455-1500
Fax:    (631) 498-0748
Email:  gus@thebasilelawfirm.com
        eric@thebasilelawfirm.com

Dated:  July 13, 2022

*Attorneys for Plaintiff DarkPulse, Inc.*

## TABLE OF CONTENTS

*INTRODUCTION* ...................................................................................................... *1*

*STATEMENT OF FACTS* ......................................................................................... *1*

*LEGAL STANDARD* ................................................................................................ *3*

*ARGUMENT* ............................................................................................................. *3*

I.   **DARKPULSE HAS PLED A PLAUSIBLE RICO CLAIM** ........................ **3**

    A.   Plaintiff Must Use New York Law to Show That the Debt Was Unlawful ................... 4

    B.   The *True* Interest Rate is Over Twice N.Y.'s Maximum Enforceable Rate ................... 5

    C.   The Savings Clause is Unenforceable Under New York Usury Law ............................. 7

    D.   DarkPulse Has Alleged that EMA is in the 'Business' of Unlawful Lending ............... 8

    E.   DarkPulse Has Properly and Plausibly Alleged that EMA Financial is an Enterprise, and that Preston and EMA Group are Culpable Persons ............................................................. 9

II.   **DARKPULSE HAS STATED PLAUSIBLE EXCHANGE ACT CLAIMS BECAUSE THE S.P.A.'S *OBLIGATE* EMA—AN UNREGISTERED DEALER—TO PURCHASE SECURITIES** ..................................................................................................... **12**

    A.   A Contract "Made in Violation" of the Act May Be Rescinded Under the Supreme Court's *Mills* Decision and the 2nd Circuit's *Pearlstein* Decision ....................................... 13

    B.   The Securities Contracts in This Case Were Made In Violation of § 15(a) and Obligate Performance that Violates § 15(a) ........................................................................................ 13

    *C.*   *Unlike in the Defendant in Vystar,* Plaintiff Has Alleged that the SPA Obligates EMA to Purchase a Security ............................................................................................................... 14

    D.   The Formation of the Agreements Violated the Act Because—Under § 15(a)(1)—EMA Was Prohibited From Effecting the Transaction ....................................................................... 15

    E.   EMA is Not Exempt from Registration as a "Trader" .................................................. 16

    F.   DarkPulse has Stated a Plausible "Control Person" Claim Against Preston ................. 17

    G.   Plaintiff's § 29(b) Claims are Not Time-Barred ........................................................... 19

III.   **DARKPULSE'S STATE LAW CLAIMS ARE PLAUSIBLE** ................................ **23**

## **TABLE OF AUTHORITIES**

### **Cases**

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
 37 N.Y.3d 320 (2021)................................................................................*passim*

*Alpha Capital Anstalt v. Oxysure Sys., Inc.*,
 216 F. Supp. 3d 403 (S.D.N.Y. 2016) ..........................................19, 20, 21, 22

*Am. E Grp. LLC v. Livewire Ergogenics Inc.*,
 2020 U.S. Dist. LEXIS 14235 (S.D.N.Y. Jan. 28, 2020........................................7

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ..........................................................................................3

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87, 98 (2d Cir. 2007) .........................................................................8

*Auctus Fund, LLC, v. Players Network, Inc.*,
 Case No. 20-cv-10766 (D. Mass. Dec. 10, 2021)............................................21

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
 692 F.3d 42, (2d Cir. 2012) ...............................................................................3

*Boguslavsky v. Kaplan*,
 159 F.3d 715 (2d Cir. 1998) .......................................................................17, 18

*Busher v. Barry*,
 2019 U.S. Dist. LEXIS 172754 (S.D.N.Y. 2019)............................................21

*Cedric Kushner Promotions, Ltd. v. King*,
 533 U.S. 158 (2001) ...............................................................................9, 10, 11

*Cedric Kushner Promotions, Ltd. v. King*,
 219 F.3d 115 (2d Cir. 2000) ..............................................................................9

*Central Sch. Dist. No. 3 of Cortlandt v. Town of Cortlandt*,
 49 A.D.2d 899 (App. Div. 2d Dept. 1975) ................................................24, 25

*Ceres Partners v. GEL Associates*,
 918 F.2d 349 (2d Cir. 1990) ............................................................................20

*Chambers v. Time Warner, Inc.*,
     282 F.3d 147 (2d Cir. 2002) ..................................................................................3

*Claflin v. Boorum*,
     122 N.Y. 385 (1890) ...............................................................................................7

*Cruz v. FXDirectDealer, LLC*,
     720 F.3d 115 (2d Cir. 2013) ..........................................................................10, 11

*Dervan v. Gordian*,
     2017 U.S. Dist. LEXIS 28551 (S.D.N.Y. Feb. 28, 2017)...................................16

*Dodds v. Cigna Sec., Inc.*,
     841 F.Supp. 89 (W.D.N.Y. 1992).......................................................................20

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*,
     755 F.2d 239 (2d Cir. 1985) .............................................................................4, 8

*Eastside Church of Christ v. National Plan, Inc.*,
     391 F.3d 357 (5th Cir. 1968) ..............................................................................15

*Endovasc Ltd. v. J.P. Turner & Co., LLC*,
     2004 U.S. Dist. LEXIS 5075 (S.D.N.Y. Mar. 30, 2004)....................................17

*EMA Fin., LLC v. NFusz, Inc.*,
     509 F. Supp. 3d 18 (S.D.N.Y. 2020) ..................................................................16

*EMA Fin., LLC v. Vystar Corp., Inc.*,
     2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021).......................................14, 15, 16

*Ernst & Ernst v. Hochfelder*,
     425 U.S. 185 (1976) ............................................................................................17

*Fezzani v. Bear, Stearns & Co., Inc.*
     382 F. Supp. 2d 618 (S.D.N.Y. 2004) ................................................................18

*Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*,
     2022 U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022) ...........................*passim*

*Frati v. Saltzstein*,
     2011 U.S. Dist. LEXIS 25567 (S.D.N.Y. Mar. 14, 2011)..................................16

*GFL Advantage Fund, Ltd. v. Colkitt*,
     272 F.3d 189 (3d Cir. 2001) ...............................................................................15

*Hammelburger v. Foursome Inn Corp.*,
    54 N.Y.2d 580 (1981) ......................................................................................... 6

*Hammelburger v. Foursome Inn Corp.*,
    76 A.D.2d 646 (2d Dept. 1980) ......................................................................... 6

*Haymount Urgent Care P.C. v. GoFund Advance, LLC*,
    2022 U.S. Dist. LEXIS 112768 (S.D.N.Y. June 27, 2022) ............................ 4, 5

*Hendry v. Hendry*,
    2006 DE Ch. LEXIS 99 (Del. Ch. May 26, 2006) ........................................ 25

*Hillair Capital Invs., L.P. v. Integrated Freight Corp.*,
    963 F. Supp. 2d 336 (S.D.N.Y. 2013) ............................................................ 6

*Hogg v. Walker*,
    622 A.2d 648 (Del. 1993) ................................................................................ 25

*Hoover v. Ronwin*,
    466 U.S. 558 (1984) ......................................................................................... 3

*In re Alstom SA Securities Litigation*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................................... 18

*In re Livent*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................................................... 18

*In re Livent, Inc. Securities Litigation*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999) ............................................................. 17

*Ingenito v. Bermec Corporation*,
    376 F. Supp. 1154 (S.D.N.Y. 1974) .............................................................. 23

*Int'l Adiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995) ................................................................................ 3

*Intima-Eighteen, Inc. v. A.H. Schreiber Co.*,
    172 A.D. 456 (1st Dept. 1991) ..................................................................... 4, 5

*Jaghory v. N.Y. State Dep't of Educ.*,
    131 F.3d 326 (2d Cir. 1997) ........................................................................... 3

*JD Anderson v. Binance*,
    2022 U.S. Dist. LEXIS 60703 (S.D.N.Y. Mar. 31, 2022) ............................ 21

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
    970 F.2d 1030 (2d Cir. 1992) ....................................................................... 19, 20, 22, 23

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991) ................................................................................................ 8

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    498 U.S. 894 (1990) ...................................................................................................... 19, 20

*Lawrence v. Richman Grp. of Conn.*, LLC,
    407 F. Supp. 2d 385 (D. Conn. 2005) ................................................................................ 19

*LG Funding, LLC v. United Senior Props. of Olathe, LLC*,
    122 N.Y.S.3d 309 (App. Div. 2d Dept. 2020) ................................................................ 5, 6

*Mantikas v. Kellogg Co.*,
    910 F.3d 633 (2d Cir. 2018) ............................................................................................... 3

*Marcus v. AT & T Corp.*,
    938 F. Supp. 1158 (S.D.N.Y. 1996) ................................................................................... 8

*Matter of Lazar v. Robinson Knife Mfg. Co.*,
    262 A.D.2d 968 (App. Div. 4th Dept. 1999) ............................................................... 24, 25

*McCall v. Frampton*,
    81 A.D.2d 607 (App. Div. 2d Dept. 1981) ........................................................................ 24

*Mills v. Electric Auto-Lite Company*,
    396 U.S. 375 (1970) .......................................................................................................... 13

*Norman v. Salomon Smith Barney, Inc.*,
    350 F. Supp.2d 382 (S.D.N.Y. 2004) ............................................................................... 23

*Oliver v. Boston Univ.*,
    2000 Del. Ch. LEXIS 104 (Del. Ch. July 18, 2000) .......................................................... 25

*Omega Overseas, Ltd. v. Griffith*,
    2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014) ................................................ 12

*Pearlstein v. Scudder & German*,
    429 F.2d 1136 (2d Cir. 1970) ........................................................................................... 13

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
    30 F.3d 339 (2d Cir. 1994) ................................................................................................. 9

*Sanders v. John Nuveen & Co.,*
    554 F.2d 790 (7th Cir. 1977) ............................................................................ 18

*SEC v. Almagarby,*
    479 F. Supp. 3d 1266 (S.D. Fla. 2020) .................................................... 16, 22

*SEC v. Fierro,*
    2020 U.S. Dist LEXIS 238936 (D.N.J. Dec. 18, 2020) ................................ 16

*SEC v. Fife,*
    2021 U.S. Dist. LEXIS 242126 (N.D. Ill. Dec. 20, 2021) ............................. 16

*SEC v. First Jersey Sec., Inc.,*
    101 F.3d 1450 (2d Cir. 1996) ........................................................................ 17

*SEC v. GPL Ventures LLC,*
    2022 U.S. Dist. LEXIS 9056 (S.D.N.Y. Jan. 18, 2022) ............................... 16

*SEC v. Keener,*
    2020 U.S. Dist. LEXIS 146256 (S.D. Fla. Aug. 13, 2020) ........................... 16

*Simsbury Fund, Inc. v. New St. Louis Assoc.,*
    611 N.Y.S.2d 557 (App. Div. 1st Dept. 1994) ................................................ 7

*Sweet Baby Lightning Enter. LLC v. Keystone Cap. Corp.,*
    2022 U.S. Dist. LEXIS 107335 (S.D.N.Y. June 15, 2022) .............................. 7

*U1it4less, Inc. v. Fedex Corp.,*
    871 F.3d 199 (2d Cir. 2017) ...................................................................... 9, 10

*UFCW Local 1500 Pension Fund v. Mayer,*
    2016 U.S. Dist. LEXIS 145091 (N.D. Cal. 2016) ........................................ 23

*United States v. Giovanelli,*
    945 F.2d 479 (2d Cir. 1991) ............................................................................ 8

*US Airways, Inc. v. Sabre Holdings Corp.,*
    938 F.3d 43 (2d Cir. 2019) ............................................................................ 23

*Ward v. Caulk,*
    650 F.2d 1144 (9th Cir. 1981) ...................................................................... 22

*Zerman v. Jacobs,*
    510 F. Supp. 132 (S.D.N.Y. 1981) ............................................................... 16

**STATUTES**

15 U.S.C. § 78cc ..................................................................................................12, 19

15 U.S.C. § 78c(a)(10) ..........................................................................................14, 16

15 U.S.C. § 78o(a)(1) ...................................................................................................14

18 U.S.C. § 1961 ...................................................................................................4, 5, 7

18 U.S.C. § 1962 .............................................................................................4, 9, 10, 11

18 U.S.C. § 1964 ............................................................................................................5

28 U.S.C. § 1658(b) .....................................................................................................20

NY Gen. Bus. Law § 359-e ..........................................................................................20

NY GOL § 5-501 .......................................................................................................5, 6

NY Penal Law § 190.40 .........................................................................................5, 7, 24

17 C.F.R. § 230.144.....................................................................................................2, 14

**RULES**

Fed. R. Civ. P. 12(b)(6) ..............................................................................................1, 3

Fed. R. Evid. 201 ...........................................................................................................8

**SECONDARY SOURCES**

Gruenbaum & Steinberg, *Section 29(b) of the Securities Exchange Act of 1934: A Viable Remedy Awakened*, 48 Geo.Wash.L.Rev. 1, 21 (1979) ...........................................................12

Louis Loss & Joel Seligman, Securities Regulation 815 (5th ed. rev. 2004)................................22

Restatement (Second) Contracts § 198........................................................................24

## <u>**TABLE OF ABBREVIATIONS**</u>

*\*Denotes an abbreviation defined in this table*

<u>*Listed by Term*</u>

DarkPulse, Inc. ......................................................................................"Plaintiff" or "DarkPulse"

Defendants' M.O.L. in Supp. of their M.T.D. the First Am. Compl................"Motion" or "MTD"

Eight-percent Convertible Note issued Sept. 25, 2018 (ECF No. 13-2) ............................. "Note"

EMA Financial, LLC ........................................................................................................ "EMA"

EMA* *and* EMA Group* ........................................................................................... "Defendants"

EMA Group, LLC.......................................................................................... "EMA Group"

EMA Group* *and* Preston* .................................................................................."EMA Managers"

Felicia Preston ..................................................................................................... "Preston"

Plaintiff's First Amended Complaint ........................................................"Complaint" or "Compl."

Securities Purchase Agreement exec'd. Sept. 25, 2018 (ECF No. 13-1) .............................. "SPA"

SPA* and Note* .......................................................................................... "Securities Contracts"

Transaction interposed by the Securities Contract ..........................................."DPLS Transaction"

*Listed by Abbreviation*

"Complaint" or "Compl." ........................................................ Plaintiff's First Amended Complaint

"DarkPulse" ........................................................................................................ DarkPulse, Inc.

"Defendants" ................................................................................................ EMA* and EMA Group*

"DPLS Transaction" ........................................... Transaction interposed by the Securities Contracts

"EMA" ........................................................................................................ EMA Financial, LLC

"EMA Group" ...................................................................................................... EMA Group, LLC

"EMA Managers" .................................................................................... EMA Group* and Preston*

"Motion" ................................. Defendants' M.O.L. in Supp. of their M.T.D. the First Am. Compl.

"MTD" ................................... Defendants' M.O.L. in Supp. of their M.T.D. the First Am. Compl.

"Note" ...................... Eight percent Convertible Note issued September 25, 2018 (ECF No. 13-2)

"Plaintiff" .................................................................................................................. DarkPulse, Inc.

"Preston" .................................................................................................................... Felicia Preston

"Securities Contracts" ............................................................................................ SPA* and Note*

"SPA" ............. Securities Purchase Agreement executed September 25, 2018 (*see* ECF No. 13-1)

## INTRODUCTION

The arguments that Defendants advance in support of their Motion do not approach the bar for dismissal under Fed. R. Civ. P. 12(b)(6).  They fail to show that DarkPulse should be denied the opportunity to prove its claims that the Defendants violated the Exchange Act and RICO, by engaging in the business of buying and selling securities without being registered as a securities dealer, and through the collection of an unlawful debt, respectively.  The Motion should be denied.

## STATEMENT OF FACTS

EMA is a New York-based Delaware-registered limited liability company that lends money to small, publicly-traded companies in need of cash.  DarkPulse is a New York-based microcap company registered in Delaware whose stock trades on the "over the counter" market.

In September 2018, EMA made a loan to DarkPulse via the purchase of a convertible promissory note ("Note") with a principal amount of $100,000.  Compl., Ex. 2 (ECF No. 13-2).  The Note charges interest at 8% A.P.R., charges a $6,000.00 original issue discount (and other fees); payment is due nine months after issuance.  *Id*. at 1.  The DPLS Transaction is constituted by two documents: the convertible Note itself, and a securities purchase agreement ("SPA") which provides the terms for the purchase of the Note and other requirements.

A convertible promissory note is a debt security that gives the lender—here, EMA—the right, in its sole discretion, to take repayment of the loan in newly-issued company stock instead of cash.  Like a stock option or warrant, the lender is given the right to 'purchase' company stock using the debt under the Note.  Unlike a stock option or warrant, however, which carries a fixed exercise price, the conversion option here has a *fixed discount* to the market price.[1]

---

[1] Instead of standard market price (average trading price or VWAP on date of transfer), the discount is based on the single lowest sale price of common stock in the 20 days prior to the conversion.  Note at ¶ 1.2.

This "floating price" conversion option guaranteed EMA a strike price pegged at (a minimum of) 30% below the market price at the time of exercise.  In practical terms, EMA was guaranteed that, for every $100 of debt converted, EMA would acquire a minimum of $142 worth of DarkPulse stock.  The value of a floating price conversion option is a finding of fact which must be included in the interest calculation for the loan.  *See Adar Bays, LLC v. Genesys ID, Inc*., 37 N.Y.3d 320, 334 (N.Y. 2021).  The SEC has long recognized the abusive nature of floating price convertible notes, referring to them as "toxic" or "death spiral" convertibles.[2]

In addition to various other penalties in the Note, Article III sets forth 19 events of default, which included breach of any of the eleven covenants in the SPA.  *See* Note, Art. III.  Section 1.1 of the Note states a default interest rate of 24% APR for amounts remaining unpaid on the due date.  Article III of the Note adds that any event of default rendered the Note "immediately due and payable," and required payment of "200 times the sum of" the outstanding principal *plus* accrued interest *plus* default interest *plus* penalties.  Note at 13-14.  These amounts were payable to EMA either in cash or in company stock at the conversion price.  *Id*.

After execution of the Note on September 25, 2018, EMA conveyed to DarkPulse the $94,000 in cash as payment for the Note.  Six months and two weeks later, EMA began conversions under the Note, selling the conversion stock into the market immediately after each conversion.[3] EMA effected 15 conversions from April through September 2019, and four more in 2020, ending on October 22, 2020.  Significantly, EMA's conversions did not utilize the 30% discount price, but instead a *55% discount price* accorded to EMA if DarkPulse's stock price fell below 3 cents

---

[2]  *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities, last accessed June 12, 2022.
[3]  EMA used the Rule 144 "tacking period" under Rule 144 to avoid the six-month restriction period normally required for newly-issued stock.  The SEC recognizes this practice as underwriting activity, and has proposed changing Rule 144 to stop this abuse.  *See* 17 C.F.R. § 230.144.

per share.  *See* Note at ¶ 1.2;[4] Compl. at ¶ 74.  Via the conversions, EMA acquired $265,493 in DarkPulse stock, and claims that at least $53,000 of debt remains outstanding.  After the parties attempted unsuccessfully to negotiate a settlement, DarkPulse filed this suit on January 4, 2022.

## LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 51-52 (2d Cir. 2012).  The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Mantikas v. Kellogg Co.,* 910 F.3d 633, 636 (2d Cir. 2018) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).  The Court may not grant a motion to dismiss unless "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief."  *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997) (quoting *Hoover v. Ronwin*, 466 U.S. 558, 587 (1984)).  "For purposes of this general rule, 'the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'"  *Chambers v. Time Warner, Inc*., 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Adiotext Network, Inc. v. Am. Tel. & Tel. Co*., 62 F.3d 69, 72 (2d Cir. 1995) (*per curiam*)).

## ARGUMENT

### I.   DARKPULSE HAS PLED A PLAUSIBLE RICO CLAIM

Defendants' arguments for dismissal of DarkPulse's RICO claim for the collection of an unlawful debt belie their confusion about the claim's pleading requirements.  To state such a claim, a plaintiff must allege facts showing that:

---

[4] *See* Compl. at ¶ 74 (alleging Defendants made numerous conversions, including on April 17, 2019).

(1) Defendants Preston and EMA Group (the "EMA Managers") are RICO culpable persons;

(2) Defendant EMA Financial is a RICO enterprise;

(3) The enterprise's activities affected interstate commerce,

(4) The EMA Managers conducted the affairs of EMA Financial through the collection of an unlawful debt;

(5) EMA's loan to DarkPulse charged an interest rate deemed usurious and unlawful under New York law;

(6) The debt created by the loan was unenforceable in whole or in part because of the same state usury laws, in this instance, the laws of New York State;

(7) The debt was incurred in connection with EMA Financial's business of lending money at a usurious rate in excess of twice the maximum enforceable rate under New York law;

(8) EMA collected on the unlawful debt; and

(9) As a result of the above confluence of factors, DarkPulse was injured in its business or property.

*See* RICO, 18 U.S.C. §§ 1961, 1962; *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 248-49 (2d Cir. 1985).  *See also Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 U.S. Dist. LEXIS 100837, *64-*65 (S.D.N.Y. June 6, 2022); *Haymount Urgent Care P.C. v. GoFund Advance, LLC*, 2022 U.S. Dist. LEXIS  112768, *13-*15 (S.D.N.Y. June 27, 2022). DarkPulse has alleged plausible facts to support all of these requirements.

### A.  Plaintiff Must Use New York Law to Show That the Debt Was Unlawful

Defendants appear to misunderstand a RICO unlawful debt collection claim, stating that DarkPulse's claim "lacks any foundation *in New York law*," as New York's criminal usury defense may only be used as an affirmative defense and cannot "be employed as a means to effect recovery by a corporate borrower."  MTD at 11 (citing *Intima-Eighteen, Inc. v. A.H. Schreiber Co.*, 172 A.D. 456, 457-58 (1st Dept. 1991)).  This makes no sense.

Unlike *Intima-Eighteen*, Plaintiff's RICO claims arise under *federal* not *state* law.  *See* Compl. at ¶¶ 142-49.  RICO requires that the debt be "unenforceable under **State** or Federal law in whole or in part … because of the laws relating to usury."  RICO, § 1961(6) (emphasis added). *See Haymount Urgent Care,* 2022 U.S. Dist. LEXIS 112768, at *14 (stating "RICO's definition of 'unlawful debt' invokes state as well as federal laws related to usury to provide substance to the concept of 'unlawful[ness].'").

Further, nothing in the RICO statute requires, as Defendants suggest, that the state or federal usury law that renders the loan unenforceable (such as NY GOL § 5-501) must also afford the damaged party a particular remedy, such as the right to seek damages.  *See* §§ 1961(6), 1964. RICO mandates only that the loan be "unenforceable" (and charge at least twice the maximum enforceable rate, *etc.*).  Recent case law in this district shows that the Courts agree.  *See Fleetwood Servs.,* 2022 U.S. Dist. LEXIS 100837, at *68-69, *73 (awarding summary judgment on corporate-borrower's RICO claim based on lender's collection of unlawful debt, where loan charged interest in excess of 50% APR (*i.e.*, more than double the rate permitted under NY GOL § 5-501 and NY Penal Law § 190.40)); *Haymount Urgent Care*, 2022 U.S. Dist. LEXIS 112768, at *12-13, *28 (denying defendants' motion to dismiss a RICO unlawful debt collection claim based on claim that the lender collected unlawful debts charging interest at a rate more than double the limitation under NY GOL § 5-501 and NY Penal Law § 190.40).  Accordingly, Defendants' objections to Plaintiff's use of and citation to New York law must fail.

### B.  The *True* Interest Rate is Over Twice N.Y.'s Maximum Enforceable Rate

Defendants say they are not usurers because the Note is not *usurious on its face.*  MTD at 13-15.  Not so.  New York's usury laws evaluate a transaction in its totality, looking beyond its mere form or the interest stated.  *See, e.g., Adar Bays*, 37 N.Y.3d at 334 ("When determining whether a transaction is a loan, substance—not form—controls."); *LG Funding, LLC v. United*

*Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 312 (2d Dept. 2020) ("[a loan] must be considered in its totality and judged by its real character, rather than by [its] name, color, or form…").   *See also Adar Bays*, 37 N.Y.3d at 334 (*all value and property* exchanged in consideration for the loan must be included to determine the loan's *true* interest rate, including the value of a conversion option); NY GOL § 5-501; Note at ¶ 1.2 (Conversion Price).

Here, the Note charged 8% APR as stated interest, with additional 8%[5] charged as an original issue discount ("OID"), as well as other deductions and fees deemed to reimbursement for expenses.   New York courts have repeatedly held that the OID *must* be included as interest when the payments do not reimburse lenders for expenses.   *See Hillair Capital Invs., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 339 (S.D.N.Y. 2013) (holding that "when fee payments do not actually reimburse lenders for expenses associated with the loan, and instead are a disguised loan payment, then such fee expenses can be considered in determining the interest rate.");   *Hammelburger v. Foursome Inn Corp.,* 76 A.D.2d 646, 648 (2d Dept. 1980), *order modified and aff'd*, 54 N.Y.2d 580 (N.Y. 1981).   The Note charged additional interest via the floating-rate conversion option that guaranteed EMA substantial added consideration.   *See Adar Bays*, 37 N.Y.3d at 334.   This interest was knowingly contracted for and intentionally collected by Defendants, and not, as Defendants' claim, upon a default.[6]

---

[5] Calculated as:
    Step 1 – Identify the OID:  $100,000.00 (Principal Amount) - $94,000.00 (Purchase Price) = $6,000.00;
    Step 2 – Calculate OID Percentage:  $6,000.00/$100,000.00 = .06 or 6%;
    Step 3 – Annualize OID Percentage (per NY usury laws): 6% X 12 (months in a year) / 9 (repayment duration in months per the Note) = .08 or **8%**

[6] Defendants claim that the conversion feature was "only available in the last 3 months" prior to the maturity date of the 9-month Note, and that as a result, the interest calculation should not include any additional value that EMA gained via any conversions *after* DarkPulse failed to pay on the maturity (*i.e.* as a result of default).   *See* MTD at 14 n.5.   This is false.   The Note provided EMA with the right to convert the debt into stock, in its sole and absolute discretion, *at any time*.   *See* Note at § 1.1 (emphasis added); *see also id.* at § 1.4.   Further, Defendants' argument goes to the *valuation* of the conversion option, which is a finding of fact and not appropriate for a motion to dismiss.

As alleged, Plaintiff's calculations show that, when the lender's guaranteed gains are properly valued, ***the true interest rate of the Note is at least 73% A.P.R.***  *See* Compl. at ¶¶ 11-12, 63-70; *Adar Bays*, 37 N.Y.3d at 334 (endorsing numerous valuation methodologies to calculate the value of "floating price" conversion options); NY Penal Law § 190.40; § 1961(6). Accordingly, Plaintiff has properly alleged that the true interest rate exceeds 50% A.P.R., *i.e.,* an amount sufficiently high to support a RICO claim for the collection of an unlawful debt.

### C.  The Savings Clause is Unenforceable Under New York Usury Law

Defendants argue that because the Note is not usurious on its face, the Note's usury savings clause saves the transaction.  *Compare* MTD at 14-15, *with Simsbury Fund, Inc. v. New St. Louis Assoc.*, 611 N.Y.S.2d 557, 558 (1st Dept. 1994).  The clause is unenforceable, as is any clause attempting to prevent a usury claim.  Courts applying New York's usury laws have *repeatedly* disregarded usury savings clauses in light of the fact that New York law unequivocally finds usurious loans to be void *ab initio,* and a loan that is void at its inception is void forever.  *See, e.g., Claflin v. Boorum*, 122 N.Y. 385, 388 (N.Y. 1890); *Sweet Baby Lightning Enter. LLC v. Keystone Cap. Corp.*, 2022 U.S. Dist. LEXIS 107335, at *12 (S.D.N.Y. June 15, 2022) ("Nor may Plaintiffs seek only the enforcement of the non-usurious portions of the loan contract, because a contract that is deemed void in its entirety cannot be severed to retain only its legal portions.  For similar reasons, the loan contract's apparent usury-savings clause … *is ineffective*.") (citing *Adar Bays*, 37 N.Y.3d at 333-34); *Am. E Grp. LLC v. Livewire Ergogenics Inc.*, 2020 U.S. Dist. LEXIS 14235, at *19 n.13 (S.D.N.Y. Jan. 28, 2020) (collecting cases and stating a "usury-savings clause in [a] note is *ineffective* under New York law") (emphasis added).  Therefore, the usury savings clause is of no effect.

### D.  DarkPulse Has Alleged that EMA is in the 'Business' of Unlawful Lending

Defendants claim DarkPulse has failed to allege that Defendants are in the business of lending at usurious rates.  MTD at 15.  Not so.  The requirement that loans be incurred "in connection with the business" of making usurious loans is aimed simply at excluding "occasional usurious transactions" by one who is not in the business of lending.  *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2d Cir. 1985).[7]  Here, the Complaint alleges that Defendants are engaged in the business of lending at a usurious rate, making specific reference to three other instances of EMA loans charging more than twice the legal rate, *see* Compl. at ¶ 57, and further alleging that between January 2015 and August 2021, Defendants made *no fewer than 395 similarly usurious loans to no fewer than 132 other companies.  See id.* at ¶ 58.  *See also id.* at ¶¶ 6, 55, 62, 82, 108.[8]  This level of lending demonstrates that Defendants are not innocent makers of "occasional" usurious loans, but, instead, are persons engaged "in the business of loan sharking" that RICO sought to punish.  *See Fleetwood Servs.,* 2022 U.S. Dist. LEXIS  100837, at *64.  Thus, Plaintiff has alleged that Defendants are engaged in the business of making usurious

---

[7] *See also United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991) ("Unlike a 'pattern of racketeering activity' which requires proof of two or more predicate acts, to satisfy RICO's "collection of unlawful debt" definition the government need only demonstrate a single collection").

[8] In further support of allegations in the Compl. (*see id.* at ¶¶ 6, 55, 57-58, 62, 82, 108), DarkPulse notes that EDGAR filings demonstrate that  EMA is—and for several years has been—in the business of usurious lending via convertible notes governed by New York law that charge a total rate of interest—consisting of stated interest, OID interest, and—per *Adar Bays*—additional conversion discount interest—in excess of 50.01% APR (*i.e.,* more than double the maximum enforceable amount under New York law), *viz.:*  Elite Data Services, Inc., Form 8-K EX-10.55 (filed July 21, 2015), available at https://bit.ly/3A9ZKah; Eventure Interactive, Inc., Form 10-Q EX-10 (filed Aug. 19, 2018), available at  https://bit.ly/3OJ3og5; IDDriven, Inc., Form 8-K EX-10.2 (filed Apr. 12, 2017), available at https://bit.ly/3I1aEkU; Immune Pharmaceuticals, Inc., Form 8-K EX-10.2 (filed Apr. 19, 2017), available at https://bit.ly/3NwpMYq; InCapta, Inc., Form 10-K EX-10.14 (filed June 8, 2016), available at https://bit.ly/3no7LkE; Lingerie Fighting Championships, Inc., Form 8-K EX-4.1 (filed Nov. 16, 2017), available at https://bit.ly/3npG9ya; NaturalShrimp, Inc., Form 10-K EX-10.2 (filed Sept 28, 2017), available at https://bit.ly/3QU1L0d; Poverty Dignified, Inc., Form 10-K/A EX-10.9.9 (filed Jan. 14, 2019), available at https://bit.ly/3QRzzv9; Friendable, Inc., Form 8-K EX-10.120  (filed Mar. 6, 2017), available at https://bit.ly/3QU0PZ; Realbiz Media Group, Inc., Form 10-K EX-10.22 (filed Mar. 26, 2018), available at https://bit.ly/3AoQOOJ.  *See* Fed. R. Evid. 201; *Kramer v. Time Warner, Inc.*, 937 F.2d 767 , 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant public documents required to be filed with the SEC"); *Marcus v. AT & T Corp.*, 938 F. Supp. 1158, 1164-65 (S.D.N.Y. 1996) (noting that on a motion to dismiss, the court may take judicial notice of public documents even if not included in or attached to complaint); *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

loans at more than double the maximum enforceable rate, and has successfully pled a claim for

RICO unlawful debt collection.  *See Fleetwood Servs.,* 2022 U.S. Dist. LEXIS 100837, at *63,

*68-69.

### E. DarkPulse Has Properly and Plausibly Alleged that EMA Financial is an Enterprise, and that Preston and EMA Group are Culpable Persons

Defendants argue that Plaintiff has failed to allege the existence of a RICO enterprise and

a RICO culpable person *distinct from one another.  See* MTD at 12-13.  While their argument is

not entirely clear,[9] distinctiveness is not lacking in DarkPulse's allegations.

Specifically, Defendants aver that "DarkPulse's RICO claim fails because the corporate

defendants may not be in an 'enterprise' by virtue of working with their sole decision maker,

Felicia Preston," for which they cite *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,*

30 F.3d 339 (2d Cir. 1994),[10] *abrogated on other grounds by Cedric Kushner Promotions, Ltd. v.

King*, 533 U.S. 158, 159 (2001), and *U1it4less, Inc. v. Fedex Corp.,* 871 F.3d 199, 206 (2d Cir.

2017).  Defendants, however, fail to appreciate that the Supreme Court has already *unanimously*

found this interpretation of § 1962(c) and the distinctness requirement erroneous and, further,

Plaintiff's RICO claim properly alleged and sufficiently distinct.

To explain, in *Cedric Kushner Promotions, Ltd. v. King*, 219 F.3d 115, 117-18 (2d Cir.

2000) (citing *Riverwoods*), the Second Circuit affirmed the trial court's decision to dismiss the

plaintiff's § 1962(c) RICO claim after finding the "King was an employee acting within the scope

---

[9] Among other things, Defendants seem to suggest *either* that DarkPulse has alleged that EMA Financial is *both* the RICO enterprise *and* the RICO culpable person (which it *has not* alleged), *or* that DarkPulse has not clearly pled which defendant is the enterprise and which is culpable person (which it *has* alleged, *see* Compl. at ¶ 13 ("EMA is an 'enterprise' as defined in [RICO]…")).  *See* MTD at 12.  Defendants also appear to ignore the definitions in the Complaint:  Defendant EMA Financial, LLC is defined to be "EMA Lending Enterprise", "EMA Enterprise", and Preston and EMA Group are defined to be the "EMA Managers."  *See* Compl. at 1 n.1.

[10] Plaintiffs' allegations are easily distinguishable from *Riverwoods*, where the plaintiff solely named "Marine Midland" as the RICO enterprise.  Here, Plaintiff distinctly names EMA as the "enterprise" and Preston as the liable "person."  Compl. at ¶¶ 13, 15.  The comparison fails because, unlike Marine Midland, the culpable party, Preston, acted through EMA as an instrument for the racketeering activity. *See id.* at ¶ 93. *See also Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d. Cir. 1994).

of his authority at DKP" and, thus, not legally distinct from the RICO enterprise—a corporation. The Supreme Court *unanimously reversed*, finding the Second Circuit's interpretation erroneous after noting that "the employee and the corporation are different 'persons,' even where the employee is the corporation's sole owner," *Cedric Kushner*, 533 U.S. at 161-64, and, thus, the plaintiff's claim easily met the "distinctness" requirement imposed by the statute. *Id.* at 163.

The one relevant, factually-specific caveat to the Supreme Court's holding can be found in *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013), where the Second Circuit evaluated a § 1962(c) claim premised on an *association-in-fact* enterprise—which is *not* alleged here. *Compare id.* at 120-21, *with* Compl. at ¶¶ 142-49.  The *Cruz* plaintiff specifically alleged that the corporation was *both* the RICO culpable person and a member of the association-in-fact enterprise. 720 F.3d at 120-21.  In affirming dismissal of RICO claim, the Second Circuit noted that while corporations are legally separate, when they "operate within a unified corporate structure" they are "guided by a single corporate consciousness" and, most important here, "*cannot be both* the 'enterprise' and the 'person' under § 1962(c)."  *Id.* at 121.

The Second Circuit then expanded the "single corporate consciousness" doctrine in *U1it4less*, where the plaintiff asserted a § 1962(c) claim *entirely consisting of related corporations*:  (1) FedEx Ground Package System, Inc. ("FedEx Ground"), the alleged RICO enterprise; (2) FedEx Corporate Services, Inc. ("FedEx Corporate"); and (3) FedEx Corporation ("FedEx"), the holding company for all FedEx subsidiaries, including FedEx Ground and FedEx Corporate (FedEx Corporate and FedEx, the two corporate RICO culpable persons.  871 F.3d at 206-07.  In light of the fact that the aforementioned enterprise and culpable persons were all operating as part of a "unified corporate structure," *id.* at 206, the Second Circuit found the distinctness requirement was not met and affirmed dismissal of the RICO claim.

Having taken a closer look at the facts at issue in *Cedric Kushner*, *Cruz*, and *U1it4less*, it is clear that Plaintiff's § 1962(c) claim is sufficiently distinct because it consists of a unified corporate structure. Indeed, like *Cedric Kushner*, Plaintiff has alleged that EMA is the RICO enterprise that is controlled by two distinct culpable persons: EMA Group and Preston—the latter of which, like Don King in *Cedric Kushner*, is a legal person that is the managing member who acted in the scope of her corporate authority, but is *not* a part of the unified corporate structure. *See* Compl. at ¶¶ 29-30, 51, 93-99.

Stated differently, the Second Circuit's *very limited holdings* are *entirely inapplicable here*. *See Cedric Kushner*, 533 U.S. at 164 ("This case concerns a claim that a corporate employee is the [RICO culpable] 'person' and the corporation is the [RICO] 'enterprise.'"). Indeed, the Southern District recognized the validity of Plaintiff's RICO claim just a few weeks ago in *Fleetwood*, 2022 U.S. Dist. LEXIS 100837, where the Southern District awarded summary judgment on the plaintiff's § 1962(c) claim asserting the corporation to be the RICO enterprise and its founder/sole employee to be the RICO culpable person. *See id.* at *27-28 (citing *Cedric Kushner*, 533 U.S. at 161-63).[11]

Defendants end their argument by claiming the Complaint "purports to allege the elements of RICO only as to EMA Financial, not EMA Group or Defendant Preston." *See* MTD at 13. This is not correct. *See* Compl. at ¶¶ 93, 94 ("Preston, as the sole owner of EMA Group, has sole and exclusive control and final decision-making authority over EMA"), 95, 97, 98, 99 ("At all times relevant hereto, the EMA Managers [Preston and EMA Group] intended to engage in the unlawful

---

[11] Furthermore, unlike the present case, *U1it4less* establishes a RICO enterprise is not sufficiently distinct from the alleged RICO person solely by virtue of their separate legal incorporation. *U1it4less, Inc. v. FedEx Corp.*, 871 F3d 199, 206 (2d Cir. 2017). The comparison fails because EMA, a legal corporation, was distinctly identified as the enterprise and Preston the liable person. Compl. ¶¶ 13, 15. Preston utilized EMA as a vehicle for the racketeering activity and was not a subsidiary or affiliated corporation. Compl. ¶ 93. *See also U1it4less*, 871 F3d at 205.

conduct herein alleged, with actual… knowledge of the illegal activities."), 143 ("Each of the EMA Managers is a RICO culpable 'person'…"), 145 ("The EMA Managers agreed to and did conduct and participate in the conduct of the Enterprise's affairs through the collection of unlawful debt from DarkPulse…"), and 147 ("The EMA Managers have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the collection of unlawful debt…"). Accordingly, DarkPulse has alleged plausible and sufficient RICO allegations against both the enterprise and the culpable persons — including Preston.

## II.  DARKPULSE HAS STATED PLAUSIBLE EXCHANGE ACT CLAIMS BECAUSE THE S.P.A.'S _**OBLIGATE**_ EMA—AN UNREGISTERED DEALER—TO PURCHASE SECURITIES

Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc, gives aggrieved parties the right to rescind a contract where the formation of the contract **_or_** the performance of the contract violates the Act or any rule or regulation thereunder:

> **_Every contract made in violation of any provision_** of this chapter or of any rule or regulation thereunder, and **_every contract … the performance of which involves the violation_** of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract…

§ 29(b) (codified as 15 U.S.C. § 78cc(b)) (emphasis added).  Congress could not have been clearer in drafting § 29(b).  Under the Section, a court must scrutinize _both_ whether the "making" of the contract was unlawful _and_ whether the "performance" of the contract "involved a violation" of the Exchange Act.  "Thus, the express terms of a contract could be perfectly lawful, yet the 'making' of the contract might involve a violation of the Exchange Act or its rules or regulations."[12]  _See also Omega Overseas, Ltd. v. Griffith_, 2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014)

---

[12] Gruenbaum & Steinberg, _Section 29(b) of the Securities Exchange Act of 1934: A Viable Remedy Awakened_, 48 Geo.Wash.L.Rev. 1, 21 (1979).

(contract may be voided under § 29(b) "where the contract was made illegally or required illegal performance").

### A. A Contract "Made in Violation" of the Act May Be Rescinded Under the Supreme Court's *Mills* Decision and the 2nd Circuit's *Pearlstein* Decision

*Mills v. Electric Auto-Lite Company*, 396 U.S. 375 (1970), is a well-known example of rescission under § 29(b) of the Exchange Act based on violations *in the formation* of a securities contract.  In *Mills*, a group of shareholders used § 29(b) to rescind a merger contract, based on their proof that the proxy-soliciting materials used to gain shareholder approval of the merger contained material misstatements, in violation of § 14(a) of the Exchange Act.  The Court held that, because the violating proxy solicitation was an "essential link in the accomplishment of the transaction," the contract was voidable under § 29(b).  396 U.S. at 385.

In *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970), the Court upheld the § 29(b) rescission of a bond purchase.  The bond contract was not illegal on its face and *did not require performance that would violate the Exchange Act*.  The broker violated Regulation T of the Exchange Act during the formation of the contract, however, because it had knowingly permitted the customer to use a bank loan to finance the purchase, which is prohibited under the Exchange Act.  *Pearlstein*, 429 F. 2d at 1140-41.

### B. The Securities Contracts in This Case Were Made In Violation of § 15(a) and Obligate Performance that Violates § 15(a)

The violations at issue can be characterized in either sense:  the Agreements were "made in violation" of § 15(a) of the Exchange Act *and* require "performance" that would violate § 15(a) of the Exchange Act.  Under § 15(a):

> It shall be unlawful for any broker or dealer … to make use of the mails or any means or instrumentality of interstate commerce *to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security* (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

§ 15(a)(1) (codified as 15 U.S.C. § 78o(a)(1)) (emphasis added).  Because the Notes at issue here are *themselves securities,* an unregistered securities dealer violates § 15(a) of the Exchange Act merely by entering into a contract to purchase the Note (violation in formation), or where the contract requires the unregistered dealer to purchase a security.

### C. Unlike in the Defendant in *Vystar*, Plaintiff Has Alleged that the SPA Obligates EMA to Purchase a Security

EMA's only real obligation under the Securities Contracts was to *purchase a security*:

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and the Purchaser agree as follows:

1. Purchase and Sale of Note.

    a) Purchase of Note.  On the Closing Date (as defined below), the Company shall issue and sell to the Purchaser, and the *Purchaser agrees to purchase from the Company, the Note*…

SPA at 1 (emphasis added).  Unlike the defendant in *Vystar*—who was unable to "identify a provision in the contracts that obligates [plaintiff] to act as a broker dealer"[13]—the Securities Contracts show that EMA's primary obligation under the SPA is to *purchase a security*.[14]  Because § 15(a) prohibits an unregistered securities dealer from "effecting a transaction in securities," EMA—an unregistered securities dealer—could not perform its contractual obligations without violating the Exchange Act.

---

[13] While *Vystar* characterizes a § 15(a) violation as "act[ing] as a broker dealer," the Exchange Act makes it unlawful for an unregistered dealer "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security."

[14] Under the Exchange Act, any promissory note with a maturity date of nine months or greater is presumptively a security.  *See* 15 U.S.C. § 78c(a)(10).  The Note would not be convertible into freely-trading stock if it were not a security to begin with.  *See* 17 C.F.R. § 230.144(d)(3)(ii).

### D.  The Formation of the Agreements Violated the Act Because—Under § 15(a)(1)—EMA Was Prohibited From Effecting the Transaction

If an unregistered securities dealer enters into a contract that effects a transaction in securities, the contract is unlawful *as made,* because an unregistered dealer violates the Exchange Act by entering into that contract to begin with.  This is the precise holding of *Eastside Church of Christ v. National Plan, Inc.*, 391 F.3d 357 (5th Cir. 1968), where the court granted rescission of a bond issued by a church to an unregistered dealer.  The Fifth Circuit held:

> Under § 15(a)(1), National was prohibited from effecting the transactions here involved and thus violated the Act by entering into those transactions.  Under the voiding provision of § 29(b), it is sufficient to show merely that the prohibited transactions occurred and that appellants were in the protected class.

391 F.3d at 362 (citations omitted).  Just like the bond in *Eastside Church*, the securities contracts in this case were unlawful as made, because EMA violated the Exchange Act by entering into those transactions.

EMA does not explain how an unregistered securities dealer might lawfully enter into, or perform the Securities Contracts without violating § 15(a).  Instead, EMA offers the conclusory remark that the Securities Contracts did not require unlawful performance and were not made in violation of the Exchange Act.  MOL at 8.  EMA then states:

> this Court has already held that a similar SPA and Note involving EMA Financial was 'neither made nor performed in violation of any federal securities laws as is required for rescission under Section 29(b).'  *EMA Fin., LLC v. Vystar Corp., Inc.*, 2021 WL 1177801, at *2-3.

*Id.*  In fact, the *Vystar* court *did not hold* that the contract in that case was "neither made nor performed in violation of any federal securities laws."  The passage quoted by EMA is from *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 202 (3d Cir. 2001), which the *Vystar* court *quoted in a parenthetical*.  No "as made" violation was alleged in *Vystar*; the court rejected the claim on the ground that Vystar "does not identify a provision in the contracts that obligates [EMA] to act

as a broker-dealer." *EMA Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020). Nonetheless, *Vystar* has been lionized for its requirement—**created *ex nihilo***—that only contracts obligating unlawful performance qualify for § 29(b) rescission. *See e.g.*, *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020) (*dicta* stating that "[in]n this District" a 29(b) claim would fail without a provision in the contract requiring the plaintiff to register as a broker (citing *Vystar*, *ExeLED*, *etc.*))[15]

### E.  EMA is Not Exempt from Registration as a "Trader"

Finally, Defendants argue that EMA is a "trader," and, thus, is not considered a "dealer" under the Exchange Act. *See* MTD at 8-9. EMA is no trader and it is not exempt from registration. The "trader exemption" argument has been rejected *every* time it has been made by parties using the *exact same business model* as EMA,[16] and fares no better in this case. As in those cases, the Complaint alleges that:  (1) EMA engaged in a substantial volume of securities transactions through, *first*, purchasing convertible notes and, *next*, effecting conversions[17] of issuer debt under

---

[15] *Vystar* and *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, 2018 U.S. Dist. LEXIS 202540 (S.D.N.Y. Sept. 28, 2018) analyzed the contracts as if they were brokerage services contracts rather than *securities contracts*. For an unlicensed broker analysis—an entirely different and distinct actor in the securities marketplace (*see* 15 U.S.C. § 78c(a)(4)(A))—and which comprise the vast majority of rescission cases based on § 15(a) violations, the contracts under scrutiny are not (and not alleged to be) securities, but simple contracts for services; merely entering into a non-securities contract does not 'effect a transaction in securities.' Where only unlicensed broker violations are alleged, the court's § 29(b) analysis is rightly limited to whether the contracts obligate the unlicensed broker to undertake any activities prohibited by § 15(a). *See Dervan v. Gordian*, 2017 U.S. Dist. LEXIS 28551 at *8 (S.D.N.Y. Feb. 28, 2017) (broker services); *Zerman v. Jacobs*, 510 F. Supp. 132 (S.D.N.Y. 1981) (broker). *See also Frati v. Saltzstein*, 2011 U.S. Dist. LEXIS 25567 (S.D.N.Y. Mar. 14, 2011) (similar analysis rejecting § 29(b) claim for contract purchasing hedge fund shares, which are not securities under the Exchange Act).

[16] *See, e.g.*, *SEC v. GPL Ventures LLC*, 2022 U.S. Dist. LEXIS 9056, at *16-17 (S.D.N.Y. Jan. 18, 2022); *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2020 U.S. Dist. LEXIS 146256, at *1271-72 (S.D. Fla. Aug. 13, 2020); *SEC v. Fife*, 2021 U.S. Dist. LEXIS 242126,, at *16-17, *19 (N.D. Ill. Dec. 20, 2021); *SEC v. Fierro*, 2020 U.S. Dist LEXIS 238936, at *5-12 (D.N.J. Dec. 18, 2020). *See also SEC v. LG Capital Funding, LLC, et al.*, Case No. 1:22-cv-03353 (E.D.N.Y. Jun 7, 2022).

[17] Pursuant to the Exchange Act's definitions of "purchase" and "sell" (*see* 15 U.S.C. §§ 78c(a)(13), (14)), a conversion pursuant to the Note, resulting in the issuance of newly issued shares of issuer common stock, constitutes *both* a purchase and sale, as it entails the *acquiring* of new securities (the newly issued shares) and *disposing* of an old security (the Note). *Accord Park & Tilford, Inc. v. Schulte*, 160 F.2d 984, 987 (2d Cir. 1947); *Hooper v. Mountain States Sec. Corp.*, 282 F.2d 195, 200-203 (5th Cir. 1960) (holding that a corporation's issuance of stock constituted a "purchase" and "sale" under the Exchange Act); *Heli-Coil Corp. v. Webster*, 352 F.2d 156, 161-167 (3d Cir. 1965) (finding a conversion of debentures into shares of common stock constitutes a "sale" and "purchase" under the Exchange Act). *See also Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir. 1999); *7547 Corp. v. Parker & Parsley*

the notes, thereby acquiring millions (if not billions) of shares of newly-issued common stock, Compl. at ¶¶ 1, 37, 41, 43, and 44; (2) *like* an underwriter, EMA acquired stock with a view to distribute and promptly sold the shares of stock it obtained from each conversion, *id.* at ¶¶ 48-53; and (3) *unlike* a trader, EMA did not purchase stock on the open market but, instead, *like a dealer,* acquired new stock, at a substantial discount, directly from the issuers, *id.* at ¶¶ 40, 55; which it immediately sold into the market in order to reap the "spread" between the discount and the market price, like an underwriter. Accordingly, EMA fits the definition of a "dealer" under the Exchange Act and does not remotely qualify for the "trader exemption" set forth in § 78c(5)(B).[18]

### F.  DarkPulse has Stated a Plausible "Control Person" Claim Against Preston

Defendants' incorrectly aver that Plaintiff has failed to plead a violation of § 20(a) against Preston. *See* MTD at 9-10.  To state a claim for so-called control person liability, the plaintiff must show: (1) a primary violation by a controlled person, *Boguslavsky v. Kaplan*, 159 F.3d 715, 720; *Endovasc Ltd. v. J.P. Turner & Co., LLC,* 2004 U.S. Dist. LEXIS 5075, at *47-48 (S.D.N.Y. Mar. 30, 2004); (2) control of the primary violator by the defendant, *Boguslavsky, supra,* at 720; *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (defendant must have possessed "the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."); *In re Livent, Inc. Securities Litigation*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999) ("Actual control is essential to control person liability."); and (3) the controlling person was "in some meaningful sense a culpable participant in

---

*Dev. Partners, LP*, 38 F.3d 211, 225-29 (5th Cir. 1994); *Poptech, LP v. Stewardship Inv. Advisors, LLC*, 849 F. Supp. 2d 249, 272 (D. Conn. 2012).

[18] Defendants have not suggested that EMA held the newly-obtained stock for a sufficient period of time, though they do argue that DarkPulse has failed to "identify even a single sale of stock." *See* MTD at 9.  As Defendants are aware, selling activity is non-public information to which DarkPulse does not have access; no one other than Defendants' employees, securities brokers, and others in a position providing direct knowledge of such information would be able to make specific allegations about this behavior. ***All of this explains why Defendants do not deny that EMA promptly sells the newly-issued stock it obtains from issuers via convertible notes.***

the primary violation." *Boguslavsky, supra,* at 720; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209 (1976) ("culpable participation" requires "something more than negligence"); *In re Livent*, 151 F. Supp. 2d 371, 412, 418 (S.D.N.Y 2001) (recklessness is the minimum level of culpability that must be pled;  "[r]ecklessness demands conduct that exceeds negligence but does not cross the threshold of intentional misconduct."). *See also Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977).  Once a plaintiff establishes a *prima facie* case for control liability, the burden shifts to the defendant to show it acted in good faith and did not directly or indirectly induce the act constituting the violation.  *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005).

Plaintiff has pled the three requirements for pleading control person liability against Preston.  *First,* as explained in detail above, Plaintiff has pled the "primary violation(s)" by EMA, the controlled person, *viz.*:  EMA violated § 15(a) of the Exchange Act through both (i) EMA's effecting (making) the securities contracts as an unregistered securities dealer, and (ii) EMA's performing under the contracts as an unregistered dealer.  *See* Compl. at ¶¶ 81-99.  Thus, DarkPulse has met the "primary violation" requirement.

*Second,* Defendants mischaracterize the Complaint by suggesting that Plaintiff's control allegations against Preston are *limited to* "'*tertiary liability*,' meaning control over one entity that then allegedly has control over another."  MTD at 10 (citing *Fezzani v. Bear, Stearns & Co., Inc.* 382 F. Supp. 2d 618, 646 (S.D.N.Y. 2004)).  Nonsense.  Plaintiff has pled that Preston had the actual power to direct, authorize, and compel EMA to engage in the violations of § 15(a) of the Exchange Act. *See* Compl. at ¶¶ 93-99.  Preston personally and through others employed by EMA, acting at Preston's direction, including EMA Group, negotiated the terms of the unlawful securities contracts.  *Id.* at ¶¶ 93-95.  In other words, Preston did not merely have and exercise tertiary

control, she had and exercised *plenary* control over EMA's operations including its alleged violations of § 15(a).  Thus, DarkPulse has properly pled the control element.

*Third,* Defendants make the blanket statement that Plaintiff failed to plead that Preston is a culpable participant.  *See* MTD at 10.  *This is untrue.  See* Compl. at ¶¶ 5, 14, 25-30, 51, 93-99, 137-141.  Plaintiff alleged that Preston had the intent to commit securities violations under the Exchange Act because Preston, from her previous experience as a registered broker, knew EMA was required to register as a dealer, but did not direct EMA or register as such before entering into the securities contracts with Plaintiff.  *See* Compl. at ¶¶ 96-97.  This rises to recklessness or more, surely exceeding mere negligence.

### G.  Plaintiff's § 29(b) Claims are Not Time-Barred

Defendants begin their statute of limitations argument by misquoting § 29(b), arguing that the statute requires that claims "must be brought within 'one year after the discovery that [a] sale or purchase involves [a violation of Section 15(a)] and within three years after such violation.' 15 U.S.C. § 78cc(b)."  MTD at 5-6.  Nowhere does § 78cc(b) (§ 29(b)) establish a limitations period for claims under § 15(a); the limitations period in that section quite clearly relates only to § 15(c), which applies to broker-dealer fraud. *See Lawrence v. Richman Grp. of Conn*., LLC, 407 F. Supp. 2d 385, 389 n.7 (D. Conn. 2005).

In addition to the misquoted statute, Defendants rely on *Alpha Capital Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403 (S.D.N.Y. 2016) and *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030 (2d Cir. 1992), for their timeliness claim, two cases that rely, in part, on abrogated law.  In *Kahn*, the Second Circuit considered the limitations period for rescission claims under § 215 of the IAA, a section widely-recognized as very similar to § 29(b).  As with § 29(b), § 215 contains no limitations period; hence, the court looked to the analysis in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 498 U.S. 894 (1990), to determine whether the one-year/three-

year limitations period should apply to § 215 rescission based on, *inter alia,* the defendant's failure to register as an investment advisor).  The *Kahn* plaintiffs argued that the one-year/three-year period applies only to claims involving fraud, and was not appropriate for unregistered-investment-advisor claim.  The Second Circuit rejected this argument and held that the one-year/three-year period applied to the investment advisor claim, observing that both the IAA and the Exchange Act were "enacted for the purpose of avoiding frauds," and noting specifically that § 15 "is an antifraud provision." *Kahn*, 970 F.2d at 1038-39.

Alpha Capital reached the same conclusion in regard to a § 29(b) claim based on an unregistered-broker violation of § 15(a).  Relying on *Ceres Partners v. GEL Associates*, 918 F.2d 349 (2d Cir. 1990) (addressing securities-fraud claims under § 10(b)), the *Alpha Capital* court applied the one-year/three-year limitations period, comparing it to the fraud claim in *Dodds v. Cigna Sec., Inc., 841 F.Supp.* 89, 92 (W.D.N.Y. 1992).

The Sarbanes-Oxley Act of 2002 applied a set limitations period for any private right of action involving "a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities law…" 28 U.S.C. § 1658(b).  Sarbanes-Oxley is well-recognized as having reset the statute-of-limitations period for all securities fraud claims (with no stated limitations period, such as under § 10(b)) to a two-year/five-year scheme.  Whether a claim under § 15(a) is governed by Sarbanes-Oxley is unclear, but the holding in *Kahn*—that § 15 is an anti-fraud statute—suggests the affirmative.  *See also* Louis Loss, SECURITIES REGULATION 25-29 (1st ed. 1951) (observing connections between broker-dealer registration laws and fraud; *e.g.* violation of NY Gen. Bus. Law § 359-e is defined as "fraudulent practice").  Under Sarbanes-Oxley's five-year statute of repose, DarkPulse would have until September 2023 (at the earliest) to bring its claim; the claim is therefore not untimely.

### 1.   EMA's Registration Status Does Not Provide Notice of Its Violations

Defendants aver that the one-year clock started to run on the date the Note was executed (*i.e.*, September 25, 2018), because "through the exercise of reasonable diligence," DarkPulse could have discovered that Defendants were not licensed broker-dealers. *See* MTD at 6. That makes no sense, however, because *Defendants have consistently maintained—as they do even now—that they are not dealers and therefore are not required to register. See Auctus Fund, LLC, v. Players Network, Inc*., 20-cv-10766, ECF No. 84 (Order) at *18 (D. Mass. Dec. 10, 2021)[19] (stating that the results of a BrokerCheck search "would not have put the [issuer] on notice of any violation because the [noteholder's] misrepresentations made the [issuer] believe that [the noteholder] was *not* a dealer and thus not required to register as such."). *See also Busher v. Barry*, 2019 U.S. Dist. LEXIS 172754, at *18-19 (S.D.N.Y. 2019).

Defendants cite two cases to support their effort to lead the Court into prematurely starting the clock on Plaintiff's Exchange Act claims:   *Alpha Capital*, 216 F. Supp. 3d 403, and *JD Anderson v. Binance*, 2022 U.S. Dist. LEXIS 60703 (S.D.N.Y. Mar. 31, 2022).   Both cases are factually distinguishable and lend no support to Defendants' arguments.   *First*, in both cases, the party seeking relief under § 29(b) *knew* that the alleged Exchange Act violator was not, in fact, registered under the Exchange Act *years* before bringing its claim.   *See Alpha Capital*, 216 F. Supp. 3d at 408; *Binance*, 2022 U.S. Dist. LEXIS 60703, at *4.   *Second*, both cases concerned unregistered *brokers*, not unregistered *dealers*, which makes a substantial difference:   The scope of facts necessary to determine whether an entity qualifies as a securities dealer (in the business of buying and selling securities for its own account, and not simply a trader) are far more complicated and less obvious than the facts needed to know if a person qualifies as a securities broker (*i.e.*,

---

[19] A copy of the *Auctus* decision is filed herewith as **Exhibit 1**.

"engaged in the business of effecting transactions in securities for the account of *others*") because "the ordinary investor does not effect transactions for the account of others."  Louis Loss & Joel Seligman, SECURITIES REGULATION 815 (5th ed. rev. 2004).

Unlike the claimants in *Alpha Capital* and *Binance*, Defendants cannot show any point in time that DarkPulse *knew* EMA was unregistered, and no point when DarkPulse knew that EMA *should have been* registered.  And that is because as noted above, *at all times—even now*—EMA maintains and represents that it is not an unregistered dealer, but simply an investor.  Stated differently, it would've been unreasonable for DarkPulse to check a registry (*i.e.*, the SEC's broker-dealer database or FINRA's BrokerCheck system) for an "investor" who repeatedly and continuously represents it does not need to register.

### 2.    Rescission is Timely Under the Continuing Violation Doctrine

Even if the Court were to apply the 1-year/3-year rule here, DarkPulse's claims would be timely under the continuing violation doctrine, which is "aimed at ensuring that illegal conduct is punished by preventing a defendant from invoking the earliest manifestation of its wrongdoing as a means of running out the limitations clock on a course of misconduct that persisted over time." *SEC v. Almagarby,* 479 F. Supp. 3d 1266, 1271 (S.D. Fla. 2020).

"A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation." *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981).  Defendant argues against a continuing violation by citing to *Kahn v. Kohlberg*, where the court rejected the doctrine for plaintiffs seeking rescission of an investment contract where the advisor was unregistered. MTD at 6.  Unlike this case, *Kahn* is a textbook example of "continual ill effects from an original violation" where the unregistered investment advisor simply provided on-going investment advice pursuant to the original contract. *Kahn*, 970 F.2d at 1041.   Here, Defendants

first violated § 15(a) in September 2018, when they used the channels of interstate commerce to execute the DPLS Transaction. But unlike the contract in *Kahn*, EMA committed a *fresh, independent violation* of § 15(a) each time it transacted in securities: each conversion, and each sale of the conversion stock made "a chain of unlawful acts" reaching back to the original contract. *See UFCW Local 1500 Pension Fund v. Mayer*, 2016 U.S. Dist. LEXIS 145091, at *36 (N.D. Cal. 2016). Although EMA could have refrained from further violations and simply taken cash as repayment of the Note, they did not do so. *See Ingenito v. Bermec Corporation,* 376 F. Supp. 1154, 1184 (S.D.N.Y. 1974). Each conversion and sale constituted an independent act inflicting a new and accumulating injury to DarkPulse and its shareholders. *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68-69 (2d Cir. 2019).

On October 22, 2020, Defendants acquired 77,623,000 shares of DarkPulse newly-issued stock via a conversion under the 2018 Note. *See* Compl. at ¶ 74. Thus, the operative date is October 22, 2020, the last violation (thus far) in a chain of unlawful acts that reaches back to, and was enabled by, the Securities Contracts. This action was commenced on January 4, 2022 and it is therefore timely.

## III.    DARKPULSE'S STATE LAW CLAIMS ARE PLAUSIBLE[20]

Defendants' arguments against Plaintiff's state claims lack no merit. *First,* as discussed in detail above, the Complaint contains ample allegations that the Defendants have been unjustly enriched *through their violations of the Exchange Act and RICO.* Equity disfavors allowing Defendants to benefit from their unlawful acts—under Federal law—which occurred at Plaintiff's expense. *See, e.g., Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp.2d 382, 389 (S.D.N.Y. 2004) (discussing void *ab initio* contracts, concluding, that "restitution continues to be available

---

[20] Defendants claim there is no diversity jurisdiction. MTD at 16-17. This was not asserted as a basis for jurisdiction.

as a remedy to a wronged party") (citing Restatement (Second) Contracts § 198); *McCall v. Frampton*, 81 A.D.2d 607, 608-09 (2d Dept. 1981) ("[W]here the agreement consists in part of an unlawful objective and in part of lawful objectives, under certain circumstances the illegality may be severed and the legal components enforced," with the final resolution look towards "prevents of unjust enrichment").  The authorities relied upon by Defendants, *see* MTD at 17, and the legal theories supporting their conclusion, are entirely based on the existence of a valid and enforceable contract—which does not exist in this case due to Defendants' violations of federal securities laws and New York's usury laws.  *See* Exchange Act at § 29(b); *Adar Bays*, 37 N.Y.3d at 323-24 (holding that loans found to be criminally usurious under NY Penal Law § 190.40 render the loan contract void *ab initio*).

    *Second,* Defendants' erroneously state that DarkPulse is requesting that "a constructive trust be imposed on shares of corporation."  MTD at 18.  Indeed, the Complaint alleges that DarkPulse is seeking to have a constructive trust be imposed on all *property* that Defendants have retained from their unlawful act.  *See* Compl. at ¶ 158-163.  *See also id.* at 33 (Prayer for Relief on Count VI).  Thus, the property may consist of cash—generated from Defendants' unlawful debt collection (via conversions) and securities transactions, and subsequent sale of the newly-issued shares of DarkPulse common stock—and stock.

    That aside, the courts of New York *and* Delaware have both recognized claims for constructive trust.  *See, e.g., Central Sch. Dist. No. 3 of Cortlandt v. Town of Cortlandt*, 49 A.D.2d 899, 901 (2d Dept. 1975) (finding "equity requires us to declare a constructive trust" over unlawfully obtained monies, even when certain claimants could not recover the illegally levied taxes); *Matter of Lazar v. Robinson Knife Mfg. Co.*, 262 A.D.2d 968, 969 (4th Dept. 1999) (unanimously affirming denial of motion to dismiss constructive trust claim where plaintiffs

alleged defendants had acted in an unlawful manner); *Oliver v. Boston Univ.*, 2000 Del. Ch. LEXIS 104 (Del. Ch. July 18, 2000) (denying motion to dismiss constructive trust claim); *Hendry v. Hendry*, 2006 DE Ch. LEXIS 99 (Del. Ch. May 26, 2006) (same).

Finally, Defendants' authority actually *supports* the constructive trust claim. *See* MTD at 18 (citing). DarkPulse has alleged that EMA is an unregistered dealer, engaged in the collection of unlawful debts, *i.e.*,unconscionable conduct—acting in violation of federal law that easily supports a claim for constructive trust. *See, e.g., Central Sch. Dist. No. 3 of Cortlandt v. Town of Cortlandt*, 49 A.D.2d 899, 901 (2d Dept. 1975) (finding "equity requires us to declare a constructive trust" over unlawfully obtained monies, even when certain claimants could not recover the illegally levied taxes); *Matter of Lazar v. Robinson Knife Mfg. Co.*, 262 A.D.2d 968, 969 (4th Dept. 1999) (unanimously affirming the trial court's denial of the defendants' motion to dismiss plaintiffs' claim for imposition of a constructive trust when plaintiffs' alleged the defendants acted in an unlawful manner); *Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) ("When one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty, a constructive trust will be imposed.").

Thus, Plaintiff's state claims are sufficiently pled to withstand the Motion.

## **CONCLUSION**

For all the foregoing reasons, Defendants' Motion to Dismiss should be denied.

DATED: July 13, 2022                         Respectfully submitted,

                                             **THE BASILE LAW FIRM P.C.**

                                             By: _Gustave P. Passanante_
                                             Gustave P. Passanante, Esq.
                                             Eric J. Benzenberg, Esq.
                                             390 N. Broadway, Ste. 140
                                             Jericho, NY 11753
                                             Tel.:    (516) 455-1500
                                             Fax:    (631) 498-0748
                                             Email: gus@thebasilelawfirm.com
                                                         eric@thebasilelawfirm.com

                                             _Attorneys for Plaintiff DarkPulse, Inc._